**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

MELISSA STONEBARGER,                )
INDIVIDUALLY AND AS                 )
REPRESENTATIVE OF THE ESTATE OF     )
VERONICA HOGLE, DECEASED,           )
AND RUTH TURNER AS NEXT FRIEND      )
OF K.T., A MINOR, AND               )
THERMAN TURNER, JR.,                )
                                    )
        Plaintiffs,                 )
                                    )
v.                                  )          Case No. 13-CV-2137 JAR/DJW
                                    )
UNION PACIFIC CORPORATION,          )
and UNION PACIFIC RAILROAD          )
COMPANY,                            )
                                    )
        Defendants.                 )

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO
COMPEL DISCOVERY**

Defendants Union Pacific Corporation and Union Pacific Railroad Company (collectively

"Defendants" or "UP") provide the Court with their Memorandum in Opposition to Plaintiffs'

Motion to Compel Production of Documents.

**NATURE OF THE MATTER BEFORE THE COURT**

This action for personal injury and wrongful death arises from a collision between a

pickup truck and a train at a public railroad grade crossing in rural Brown County, Kansas.

Pending before the Court is Plaintiff's Motion to Compel certain discovery from UP.

**STATEMENT OF FACTS**

1.      This action arises from a pickup truck/train collision that occurred on October 29,

2012, when a pickup truck driven by decedent Therman Turner, in which decedent Veronica

Hogle was riding as a passenger, collided with a UP freight train.

1

2.      Both decedents died from injuries incurred in that collision.

3.      The lead locomotive of the train was equipped with a Track Image Recorder ("TIR"), a train-mounted camera located in the cab of the locomotive that captures video footage as the train moves down the track; the device also captures audio, including the sounding of the locomotive's horn.  The TIR is akin to the "dash cams" mounted in police cruisers.

4.      The TIR footage[1] from the subject accident, which captured the movements of the train and pickup before the collision, shows precisely how and where the accident occurred.

5.      The TIR shows the Turner vehicle approaching the public crossing at the intersection of UP's tracks and 260th Road, about 2.5 miles northwest of Hiawatha, Kansas in a rural part of Brown County, Kansas.

6.       The crossing was protected by two reflectorized crossbuck signs, as well as an advanced warning sign.

7.      Mr. Turner was traveling at about 55 MPH and UP's train was traveling northbound at about 40 MPH at the time of accident.

8.      As clearly evidenced by the TIR video, decedent Turner failed to heed the whistle sounded by UP's train on its approach to the crossing or the reflectorized crossbuck signs at this particular crossing.

9.      There is no evidence that the underlying accident was improperly investigated.

10.     There is no evidence of any spoliation regarding the underlying accident.

11.     On September 10, 2013, Plaintiffs served discovery on Defendants.  *See Memorandum in Support of Plaintiff's Motion to Compel Discovery (Doc. 43-1) at pp. 1-2; Exhibit 2 Containing Subject Discovery Requests and Defendants' Responses (Doc. 43-3).*

---

[1] UP submitted a copy of the TIR video to opposing counsel subject to the conditions of the Second Agreed Protective Order (Doc. 20).

12.     After mutual agreement for extensions of time, Defendants answered this discovery on November 14, 2013.  *See* Doc. 43-1 at p. 2; Doc. 43-3.

13.     On January 8, 2014, Plaintiffs sent a letter to Defendants responding to certain objections and expressing a desire to resolve outstanding disputes regarding particular discovery requests without requiring the involvement of the Court.  *See Doc. 43-1 at p. 2; "Golden Rule" Letter from Plaintiffs' Counsel, dated January 8, 2014 (Doc. 43-2).*

14.      In the days and weeks following this letter, counsel for Plaintiffs and Defendants engaged in several lengthy discussions to meet and confer on this discovery, and were able to reach agreement on many of the discovery issues.  See Doc. 43-1 at p. 2.

15.     Nevertheless, on February 14, 2014, Plaintiffs filed the underlying Motion to Compel Discovery (Doc. 43), together with corresponding exhibits (Docs. 43-1, 43-2, and 43-3).

16.     Defendants have continued to work with Plaintiffs in attempting to reach a resolution of these remaining claims, including sending clarifying letters further outlining their positions on particular disputes.  *See Letter of February 24, 2014 (attached as "**Exhibit A**"); Letter of March 11, 2014 (attached as "**Exhibit B**").*

17.     The only discovery disputes remaining in active contention are Plaintiffs' Requests for Production Nos. 41, 63, 64, and 67.  *See March 11, 2014, **Ex. B**, at pp. 2 and 3.*

### STATEMENT OF QUESTIONS PRESENTED

1.     Have the Plaintiffs carried their burden of establishing the facial relevance of their document Requests?

2.     Is Plaintiffs' Motion proper, given that they have wholly failed to address the merits of or put "into play" any of UP's objections to their Requests?

## ARGUMENTS AND AUTHORITIES

The outstanding Requests for Production seek three general categories of documents: (1) reports from incidents occurring at different crossings under unique circumstances over a broad geographical range and length of time (Requests for Production Nos. 63 and 64); (2) a copy of each and every version of UP's "accident investigation guidelines manual" referenced in a highly inflammatory and inadmissible *New York Times* article from 2004 (Request for Production No. 67); and (3) all physical, eye tests, hearing tests, and any other "health-type" tests for each non-party member of the train crew **from their first day of employment to the present** (Request for Production No. 41). These Requests are overbroad on their face, and represent classic "fishing expedition" inquiries, specifically designed to burden, harass, embarrass, and wage a war of paper by pursuing information that has no logical connection to any genuinely disputed factual or legal issues in the present case.

As set forth in greater detail below, Plaintiffs' Motion to Compel should be denied for the following reasons: (1) Plaintiffs have failed to address the substance of the railroads' particular objections and have therefore failed to properly define the issues before the Court; (2) Plaintiffs' requests are facially overbroad and burdensome, in part because of the frequent use of omnibus terms that this Court has repeatedly condemned; (3) Plaintiffs' requests are not properly limited in time and scope; (4) Plaintiffs have failed to carry their burden of demonstrating the relevance of documents whose relevance is not readily apparent; and (5) Plaintiffs have requested documents that are privileged. As to Plaintiffs' Request No. 67 specifically, referencing a 2004 *New York Times* article, and seeking numerous versions of UP's "accident investigation guidelines manual" over the past ten years, this request is further improper on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence, but would only lead,

4

if anything, to other irrelevant documents and information, and otherwise inadmissible hearsay and character evidence.  Plaintiffs' Request No. 41, seeking without limit every "health-type" record of the train crew for their entire term of employment, is also clearly calculated to embarrass, harass, invade privacy, and also represents a patent violation of both HIPAA and the physician-patient privilege.

I.    **THE DEFICIENCIES IN PLAINTIFFS' REQUESTS AND SUBSEQUENT MOTION TO COMPEL**

A.    **Plaintiffs Have Failed to Confer in Genuine "Good Faith" and Properly Address the Substance of the Railroad's Outstanding Objections and Have Therefore Failed to Properly Define the Issues Before the Court.**

D. Kan. Rule 37.2 requires the moving party's attorney to confer or make a reasonable effort to confer concerning the matter in dispute, and to do so in "good faith."  These conference requirements encourage resolving discovery disputes without judicial involvement. *Cotracom Commodity Trading Co. v. Seaboard Corp.,* 189 F.R.D. 456, 459 (D.Kan. 1999).  When the dispute involves objections to requested discovery, "parties do not satisfy the conference requirements simply by requesting or demanding compliance with the requests for discovery." *Id*.  While the parties have conferred at length about several discovery disputes, and have reached a resolution as to many of them, Plaintiffs' outstanding requests remain facially irrelevant, overly broad, and/or unduly burdensome.

In fact, as the Court can see from a cursory review of the subject objections, UP repeatedly notes it is objecting because the discovery is "facially" improper.  Rather than narrowing the focus of their Requests, or explaining the relevance or need for such a broad range of documents, Plaintiffs in large part simply cite again to general legal platitudes, repeating what documents or information they want produced, and then requesting that this Court order the railroad to produce the information or documents.  *See Docs. 43, 43-1, and 43-3.*  Such a Motion

to Compel fails both to satisfy the requirements of D. Kan. Rule 37.2 and to meet Plaintiffs' initial burden to put the railroads objections "into play."  *See Cotracom,* 189 F.R.D. at 459.

In *Sonnino*, Judge Waxse clarified that it is up to the party moving to compel to at least address the merits of the responding parties' objections before the responding party must support its objections and the Court is obliged to rule upon them.  *Sonnino v. Univ. of Kansas Hosp. Auth.*, 221 F.R.D. 661, 670 (D.Kan. 2004).[2]  Judge Waxse stated:

> The Court wishes to emphasize that the party filing the motion to compel has the initial burden of addressing each boilerplate objection in its motion to compel. By doing so, that brings the objection "into play" and places the burden on the objecting party to support its objections. *If the moving party fails to address an objection in its motion to compel, the objecting party need not raise it, and the objection will stand.*

*Sonnino*, 221 F.R.D. at 671, fn 37 (emphasis added).  Here, Plaintiffs have failed to specifically or adequately address the actual substance or merit of the railroads' outstanding objections.  For example, in addressing UP's objections relating to Request No. 41, in response to UP's argument that this request is vague and ambiguous, Plaintiffs' simply respond "[t]here is nothing vague and ambiguous about this request."  *Doc. 43-3, at p. 19.*  Similarly, in response to UP's assertion that the request is not reasonably limited in time or scope, Plaintiffs offer no explanation or willingness to modify the time or scope of their Request at all.  *See id.*  Consequently, Plaintiffs have failed to bring those objections "into play."  As such, under the foregoing authority, the railroad's objections are not ripe for Court consideration and should stand.  *Id.*

## B. Plaintiffs' Requests Are Facially Overbroad, Unduly Burdensome, and Fail to Identify the Documents or Information Sought With Reasonable Particularity.

---

[2] Federal courts have held that "boilerplate" objections such as irrelevant, overly broad, or unduly burdensome are proper when the discovery sought is *facially* irrelevant, overbroad, unduly burdensome, etc.  *See Sonnino.*, 221 F.R.D. at 671, fn 36 (noting "[u]nless a request is overly broad, irrelevant, or unduly burdensome *on its face*, the party asserting the objection has the duty to support it objections")(emphasis original); *See also Hammond v. Lowe's Home Centers, Inc.*, 216 F.R.D. 666, 670 (D.Kan 2003)(stating "when the request is overly broad on its face or when relevancy is not readily apparent, the party seeking the discovery has the burden to show the relevancy of the request").

Rule 34 requires that "the request must describe with reasonable particularity each item or category of items to be inspected." Fed. R. Civ. P. 34(b)(1). A chief problem with Plaintiffs' outstanding Requests is that Plaintiffs continually use words or phrases that render the Requests facially overbroad. For example, in each of their remaining Requests, Plaintiffs seek "each and every version" of a guidelines manual, or "any and all" reports. This Court has consistently held that the use of such omnibus words or phrases as applied to a general category or broad range of documents makes those discovery requests overly broad on their face and excuses the responding party from having to further explain its burden of responding. *See Johnson v. Kraft Foods N. Am., Inc.*, 238 F.R.D. 648, 658 (D.Kan, 2006); *Naerebout v. IBP, Inc.,* Civ. A. No. 91-2254-L, 1992 WL 754399, at *10 (D.Kan. Aug. 19, 1992); *Sonnino*, 221 F.R.D. at 667.

Discovery need not use the particular words or phrases identified in these specific cases in order to be facially improper if the "overall wording" makes the request facially unduly burdensome and overly broad. *Moss v. Blue Cross & Blue Shield of Kansas, Inc.*, 241 F.R.D. 683, 689-90 (D.Kan. 2007). In *Audiotext Communications v. U.S. Telecom, Inc.*, Case No. 94-2395, 1995 WL 18759 (D.Kan. Jan. 17, 1995), the Court stated:

> [r]equests which are worded too broadly or are too all inclusive of a general topic function like a giant broom, sweeping everything in their path, useful or not. They require the respondent either to **guess** or **move through mental gymnastics** which are **unreasonably time-consuming** and **burdensome** to determine which of many pieces of paper may conceivably contain some detail, either obvious or hidden, within the scope of the request. The court does not find that reasonable discovery contemplates that kind of wasteful effort. *Id.* at *1 (emphasis added).

Each of the outstanding Requests from Plaintiffs invokes precisely the concerns addressed here. As to Request Nos. 63 and 64, there are ninety-one (91) crossings in Brown County, Kansas. Even limiting those Requests to seek "any and all reports" from a five-year

time period and to reports from incidents at "wooded" or "rural" crossings alone, would do little to eliminate the need for the guesswork, speculation, and "mental gymnastics" this Court has expressly condemned.  Likewise, responding to Plaintiffs' Request for "any and all versions" of UP's "accident investigation guidelines manual," from 2004 to the present, would be daunting, if not impossible, as such manual is no longer used, and even in 2004 was a fluid compilation of information.  Perhaps most egregious is Plaintiffs' Request No. 41, seeking every "health-type test" for the train crew's **entire period of employment**.  Without question, each of Plaintiffs' outstanding Requests fails to comply with both the spirit and the letter of Rule 34, and suffers the fatal infirmity (i.e. necessitates guesswork and "mental gymnastics") that this Court has repeatedly condemned in its rulings on discovery motions.

### C.    Plaintiffs' Requests Are Not Properly Limited in Time or Scope.

Plaintiffs' outstanding discovery requests are also not properly limited in time or scope. This Court has held that a discovery request's lack of proper temporal scope can render it facially overbroad.  *Johnson*, 236 F.R.D. 535, 543 (D.Kan. 2006); *Hammond v. Lowe's Home Centers, Inc.*, 216 F.R.D. 666, 672 (D.Kan. 2003).  Similarly, this Court has noted that a lack of proper geographic scope will render a discovery request facially overbroad.  *Cromwell v. Sprint Communications Co. L.P.*, Case No. 99-2125, 2000 WL 726339, *8 (D. Kan. May 26, 2000) (indicating that lack of proper geographic scope can render a request facially overly broad).

Courts construing requests similar to those propounded by Plaintiffs in this case, seeking to explore large volumes of the defendant's unrelated files and materials, have found them objectionable.  In *Lytle*, for example, the Indiana Circuit Court found that Ms. Lytle had "not identified any documents or things sought **with sufficient specificity** to enable defendant to **intelligently respond** or the Court to **intelligently rule**.  Instead, plaintiff has asked to go into

Ford's databases and look for any relevant information that might be there. This is clearly not permissible under the rules." *Lytle v. Ford Motor Co., Inc.*, Case No. 54C01-8910-CP-0532, 2003 WL 23855089, *3 (Ind. Cir. April 19, 2003)(emphasis added)(citing *Amcast Indus. Corp. v. Detrex Corp.*, 138 F.R.D. 151, 121 (N.D. Ind. 1991)).

The type of discovery the *Lytle* Court refused to allow (i.e., database mining) is precisely the type that Plaintiffs are seeking to undertake via Requests No. 63 and 64. Plaintiffs have essentially asked for everything that could be designated as a "report" relating to any incident at any of 91 crossings over a five-year period in hopes that the railroads will respond with something relevant. Such a tactic is clearly not permissible. *See Cummings v. Gen'l Motors Corp.*, Case No. 00-1562, 2002 WL 32713320, *8 (W.D. Okla. 2002) (plaintiffs' proposed discovery was nothing more nor less than an attempt to rummage around in Defendant's files).

Plaintiffs' Requests Nos. 63 and 64 seek reports from the past five (5) years. On its face, this is an improperly overbroad temporal limit, but the impropriety becomes even more apparent when considering that it also refers to a geographical area encompassing 91 railroad crossings. Compiling documents from such a lengthy period of time for such a broad geographic area would be overwhelming. Similarly, Plaintiffs' Request No. 67 seeks the 2004 version of a UP "accident investigation guidelines manual," as referenced in a 2004 *New York Times* article, and every modified version of that "manual" over the next ten years. UP's "manual" in 2004 was a "living" document, subject to frequent modifications. UP no longer utilizes any of these manuals, and has not for several years. No such manual was used in investigating the present incident. Setting aside for the moment the relevance of a 10-year-old manual, producing an exact version of what that "manual" would have been in 2004 is an extreme challenge, requiring considerable speculation and guesswork; and producing every succeeding version of that

9

"manual" over the next ten years would be nearly impossible, and extremely burdensome on its face. Plaintiffs have not demonstrated any reason for the production of "any and all" such documents.

      **D.**     **Plaintiffs Have Failed to Carry Their Burden of Demonstrating the Relevance of Documents Whose Relevance Is Not Readily Apparent.**

Further, and perhaps most significantly, the "relevance" of the documents Plaintiffs request is not readily apparent. When the relevancy of a discovery request is not readily apparent on its face, the party seeking the discovery has the burden to show the relevancy of the request. *Cardenas v. Dorel Juvenile Group, Inc.*, 230 F.R.D. 611, 616 (D. Kan. 2005); *See also Western Resources, Inc. v. Union Pac. R.R. Co.,* Case No. 00-2043, 2001 WL 1718368, at *3 (D.Kan. Dec. 5, 2001)(citing *Audiotext*, 1995 WL 18759 at *1 and *Cotracom Commodity Trading Co. v. Seaboard Corp.,* 189 F.R.D. 655, 666 (D.Kan.1999)).[3]

Numerous courts have recognized that, even when other accidents have occurred at **the same crossing**, evidence about those other accidents is irrelevant unless those other accidents occurred under circumstances similar to those of the accident at issue. *See, e.g., First Security Bank v. Union Pacific R.R. Co.*, 152 F.3d 877, 879-80 (8th Cir. 1998) (affirming exclusion of evidence of other accidents because of their lack of similarity); *Kuper v. Chicago & N.W. Transp. Co.*, 290 N.W.2d 903, 909 (Iowa 1980) (holding that because other accidents were not sufficiently similar, trial court erred in admitting evidence about them); *Missouri P. R.R. Co. v. Cooper*, 563 S.W.2d 233, 236 (Tex. 1978) (similar holding).

Furthermore, it is a general principle that in a negligence case, evidence that a party acted negligently at a time and place remote from the subject incident's location is irrelevant and hence

---

[3] *See also Aikens v. Deluxe Fin. Servs.*, 217 F.R.D. 533, 537-38 (D.Kan. 2003) (noting that discovery requests can be facially unduly burdensome and overly broad if the request's wording "requires the answering party to 'engage in mental gymnastics to determine what information may or may not be remotely responsive'"); *Bailey v. SBC Disability Income Plan*, Case No. 05-4093, 2006 WL 3759578, at *4 (D.Kan. Dec. 19, 2006)(same).

inadmissible.  The Kansas Supreme Court has held that evidence that a train failed to sound an

audible warning at other locations or at remote points in time was irrelevant and inadmissible.

*Chicago, R.I. & Pac. Ry. Co. v. Durand*, 69 P. 356, 357-358 (Kan. 1902)(finding that evidence

that engineer did not sound an audible warning at a crossing immediately before the crossing

where the accident occurred was irrelevant); *Southern Pac. Co. v. Harris*, 80 Nev. 426, 432, 395

P.2d 767, 770 (Nev. 1964)("[c]itation of authority is unnecessary to support the proposition that

the personal conduct of the employees in control of the locomotives at such prior times is not

probative of the conduct of the employees (engineer and fireman) on the occasion in question").

 Plaintiffs have not demonstrated any potential relevance of information to be derived

from reports of incidents in a remote time or place, which involve different sight-lines,

signalization, track geometry, weather conditions, lighting, road conditions, and different train

crews.  Plaintiffs have likewise failed to demonstrate, and cannot demonstrate, the relevance of a

ten-year-old, 2004 version of a manual that is no longer used (and has not been for

approximately 10 years) and absolutely was not used in investigating the underlying incident.

There is no evidence of impairment or health problems on the part of any member of the non-

party train crew involved in this incident, so these "health-type" materials are likewise

irrelevant.  Simply put, UP should not be required to produce these unrelated, irrelevant, and

burdensomely large quantities of documents and materials.  UP's production of reports relating

to the subject incident and the then-applicable version of its "investigation guidelines" is more

than fair.

### E.    Plaintiffs Have Requested Documents That Are Privileged.

These documents are also undoubtedly protected from discovery by the attorney-client

and work produce privileges, as well as the discovery privileges afforded by 23 U.S.C. § 409

and 49 U.S.C. § 20903.  Specifically, Plaintiffs' Requests seeking "any and all reports of

railroad crossing accidents or train accidents" (Requests Nos. 63 and 64) clearly invoke

attorney-client and work product privileges, as well 23 U.S.C. § 409 and 49 U.S.C. § 20903.  On

their face these Requests would include reports prepared by UP's in-house counsel, outside

counsel, and agents for both, prepared in anticipation of litigation and/or for the purpose of

increasing and improving crossing safety.  Likewise, Plaintiffs' Request No. 67, seeking

numerous versions of UP's accident investigation manual over the past ten (10) years, raises

attorney-client and work product issues as well.

 Plaintiffs suggest that these reports and manuals are not privileged materials at all, but

merely documents prepared in the normal course of business.  *See* Doc. 43-1, at pp. 4-5.  As

noted in the *State ex rel. Terminal R.R. Ass'n of St. Louis v. Flynn*, 257 S.W.2d 69, 74 (Mo. banc

1953) case, it would be "naive" in this day and age not to recognize that when an accident like

this happens, litigation is anticipated.  Here, the all-encompassing language used in Plaintiffs'

discovery requests sweep within their grasp materials that are unquestionably privileged.

 Plaintiffs also accuse UP of "intentionally refus[ing] to provide a privilege log,"  *See*

Doc. 43-1, at pp. 4-5.  This complaint is inaccurate, premature, and improper.  Federal Courts

have routinely recognized that Rule 26(b)(5) cannot be used as a weapon in the sense that

generating a privilege log will, in and of itself, be unduly burdensome. *In re Imperial Corp. of

America*, 174 F.R.D. 475, 479 (S.D. Cal. 1997) (noting that Rule 26(b)(5) "expressly

recognize[s] that there are circumstances in which a document-by-document privilege log would

be unduly burdensome and inappropriate"); *see also Auto. Club of New York, Inc. v. Port Auth.

of New York and New Jersey* 297 F.R.D. 55 (S.D.N.Y. 2013); *Del Campo v. American

Corrective Counseling Services, Inc.*, 2007 WL 4287335, *4 (N.D.Cal. 2007)(finding it would

be an unfair and undue burden to force party to create a privilege log containing every letter between attorney and client).

The Plaintiffs' failure to request documents with sufficient particularity, relying on requests that are facially overbroad and unduly burdensome, makes it impossible for UP to prepare a comprehensive privilege log, and unduly burdensome to even try.  Even attempting to compile such a privilege log based on Plaintiffs' facially overbroad requests would itself impose an undue burden and require monumental efforts.  Plaintiffs cannot reasonably expect UP to provide a privilege log without first complying with the requirement that documents be identified with reasonable particularity, narrowed to that which is at least potentially relevant to the underlying case.

### F.      Plaintiffs' Requests Seek Private, Privileged, HIPAA-Protected Documents.

Though Plaintiffs have essentially elected to ignore UP's arguments on this point, Plaintiffs' Request No. 41 clearly seeks private information regarding the medical histories of UP's non-party employees, which UP is prohibited from disclosing pursuant to the Health Portability and Accountability Act (HIPAA), 42 U.S.C.A. §§ 1320(d)-1320(d)8.  UP has no obligation to seek a HIPAA waiver from its own employees, nor must it subject itself to HIPAA penalties merely to satisfy the Plaintiffs' curiosity.

In addition, Kansas's physician-patient privilege also applies and precludes UP from disclosing these records.  *See K.S.A. § 60-427*; *Bryant v. Hilst*, 136 F.R.D. 487, 490 (D. Kan. 1991)(recognizing K.S.A. § 60-427 governs physician-patient privilege in Kansas Federal Court).  The members of the train crew are not parties to this action, they are not the plaintiffs in this action, and they have done nothing to waive this privilege.  *See id.*  On these grounds alone, UP should not be compelled to produce these records.

Moreover, neither a HIPAA waiver nor a protective order would protect these employees' very real privacy interests in the contents of these records.  As the courts have recognized, even run-of-the-mill employment records have protectable privacy interests.  *See, e.g., State ex rel. Delmar Gardens N. Operating, LLC v. Gaertner*, 239 S.W.3d 608, 611 (Mo. banc 2007) (recognizing a right of privacy in personnel records "that should not be lightly disregarded or dismissed") (citing *State ex rel. Crowden v. Dandurand,* 970 S.W.2d 340, 343 (Mo. banc 1998) ("Employees have a fundamental right of privacy in employment records")). Even discovery of personnel records must be "limited to information that relates to matters put at issue in the pleadings, especially in relation to sensitive personal information." *State ex rel. Madlock v. O'Malley,* 8 S.W.3d 890, 891 (Mo. banc 1999); *see also State ex rel. Crowden,* 970 S.W.2d at 343 (holding that a subpoena for employment records "must be limited to the issues raised in the pleadings.").  If employment records are worthy of these protections, then certainly medical records—which would quite probably contain the most sensitive information in those records—would merit protection as well.

Again, Plaintiffs have failed to show the relevance of any of the information sought in their Request No. 41, have failed to show how the information sought relates to the matters put at issue in the pleadings, and have not provided any reasonable justification for their need to acquire every "health-type" record for these employees' entire periods of employment, which would encompass several years of completely irrelevant and potentially quite sensitive content. The fact that Plaintiffs have been persistently unwilling to limit the facially broad scope of this Request in terms of time or type of materials sought suggests its real purpose is merely to harass, embarrass, and inconvenience.  Plaintiffs' contention that UP should not be able to object to this Request because UP has sought similar materials from Plaintiffs is unavailing.  Plaintiffs are

parties to this action, and by bringing this action, they have put the decedents' condition directly at issue, thus waiving that privilege. *See Lake v. Steeves*, 161 F.R.D. 441, 442 (D. Kan. 1994). The same justifications do not apply to non-party members of UP's train crew.

## II.   THE MERITS OF CERTAIN OF THE RAILROAD'S OBJECTIONS TO THE SUBJECT DISCOVERY.

### 1.   Discovery Requests Addressed to UP's Reports and Related Investigatory Materials and Processes

In Plaintiffs' outstanding Requests to UP, Plaintiffs are seeking the production of reports, records, and historical manuals, not for the actual underlying incident, or even for the underlying crossing, but for materials relating to **other** accidents at **remote** crossings going back 5 to 10 years. Even just reports relating to the subject crossing (which UP has agreed to produce subject to the terms of the protective order) would raise serious attorney-client privilege and work product concerns; as applied to all reports from incidents arising at 91 crossings over a 5-year period, the privilege and work product implications become overpowering.

The initial investigation of a potential claim, made before the commencement of litigation, and requested or made under the guidance of legal counsel, is subject to the work product privilege and is protected from disclosure. *Heany v. Nibbelink*, 23 Kan.App.2d 583, 588-89, 932 P.2d 1046, 1049-50 (1997). Attorneys are permitted to use non-lawyers, such as investigators and paraprofessionals, to act for the lawyer without waiving the work product privilege. *Zimmerman v. Mahaska Bottling Co.*, 270 Kan. 810, 816, 19 P.3d 784, 790 (2001).

UP's Law Department directs the means and manner by which UP's claims representatives investigate the railroad's potential liability when a crossing accident occurs. This includes the assembling of **reports** created during the investigation by the claims representative. Both outside attorneys and UP's Law Department regularly communicate with claims

representatives to obtain information and to direct the investigation.  The chief purpose of this investigation is to allow UP to defend itself against personal injury claims.  As such, the reports and materials Plaintiffs seek clearly would have been compiled in anticipation of litigation and under the direct control and supervision of UP's legal departments and outside counsel.

Several state and federal courts have determined that evidence, including statements and interview notes developed by an employee on behalf of a defendant in anticipation of litigation, are protected by the work-product doctrine.  Highly persuasive on this point is the Missouri Supreme Court decision in *Flynn*, *infra*—which directly involved discovery of railroad reports and investigatory materials – and based its attorney work-product doctrine analysis on the Federal Rules of Civil Procedure.

In *State ex rel. Terminal R.R. Ass'n of St. Louis v. Flynn*, 257 S.W.2d 69, 73 (Mo. banc 1953), the Missouri Supreme Court held that a circuit judge exceeded his authority in compelling a railroad to produce photographs of an accident taken by the railroad's claim representatives shortly after an accident.  The agent, an employee of the railroad, had investigated the incident immediately after it occurred because it was considered a part of his duties as a railroad employee.  The Court found that the photographs fell within a privilege, stating:

> A statement concerning an accident obtained by an employer from his servant for the bona fide purpose of being later transmitted to the employer's attorney for advice, or to be used by the attorney in connection with pending or threatened litigation, is privileged, because it is part of the communication from the client to his counsel. The same is true of a statement by the accredited agent of a corporation, giving his account of an accident for use of counsel in pending or threatened litigation.

*Id*. at 73 (quoting, 58 Am. Jur. 282, Witnesses, § 503).

Plaintiffs appear to argue that no privilege applies in this case because the reports were generated in the "ordinary course" of the railroad's business.  See Doc. 43-1 at p. 2.  But

16

Plaintiffs cite to no case law to support this proposition.  *See id.*  This is not surprising, as the courts have expressly rejected this argument.  In *Flynn*, *supra*, for example, the Court explained that a railroad's ordinary course of business is to move freight, not investigate accidents. Specifically, the Court explained:

> Plaintiff offered no evidence tending to show that the taking of the photographs in question was a part of the ordinary and usual course of defendant's business in the operation of a railroad or that the taking of the photographs was in anywise intended to facilitate the operation of such railroad or to further its interests as such. Instead, plaintiffs' own evidence showed that the photographs were taken, developed and delivered to defendant's claim department. Further, it clearly appears that defendant could reasonably anticipate litigation in view of the injuries sustained by plaintiff. ***In this day and time no one would be so naive as not to know that at the time the photographs were taken a 'potential law suit or claim for damages' was immediately impending and that litigation could reasonably be expected… We may not assume that the defense of personal injury claims is a part of the usual and ordinary business for which the railroad corporation was organized and exists***, so as to make such photographs open to discovery where they were taken in preparation for the defense of anticipated litigation and after the cause of action accrued.

*Flynn*, 257 S.W.2d at 74 (emphasis added); *see also May Dept. Stores Co. v. Ryan*, 699 S.W.2d 134, 136 (Mo. App. E.D. 1985)(characterizing as "naïve" one who failed to recognize that litigation would ensue after a serious injury and concluding that written report of an employee to his employer regarding an accident was made for potential use in future litigation); *Almaguer v. Chicago, R. I. and Pac. R.R. Co.*, 55 F.R.D. 147 (D. Neb. 1972)(finding work product privilege applied to witness statement taken by the railroad's claims agent shortly after an accident had occurred, finding statement was made in anticipation of litigation); *See also Eoppolo v. Nat'l R.R. Passenger Corp.*, 108 F.R.D. 292 (E.D. Penn. 1985).

The sole reason UP has a claims department, which operates under the supervision of UP's Law Department, is to investigate incidents that UP reasonably and justifiably believes will

result in litigation.  Because of the anticipation of litigation, UP's claims representatives investigate accidents such as the one underlying this case as soon as they are reported.  To suggest that UP did not reasonably anticipate litigation after receiving notice of decedents' injury would be, in the words of the *Flynn* and *May* Courts, *supra, naïve*.

It is also important to note that Plaintiffs have failed to even assert in their Motion that they are unable to obtain without undue hardship the substantial equivalent of the information contained in the subject reports or that they have substantial need of the materials contained therein.  *See* Fed.R.Civ.P. 26(b)(3).  UP has agreed, subject to the protections of the protective order, and without waiving its privilege or work product claims, to produce both reports relating to the actual incident and the investigatory guidelines actually in use at the time of that incident. *See* Letter of March 11, 2014 (attached as "**Exhibit B**").  As such, Plaintiffs have access to all relevant reports and guidelines, thus there is no need, substantial or otherwise, for this wide array of additional materials.

For the foregoing reasons, Plaintiffs' outstanding Requests Nos. 63, 64, and 67 each seek documents and information protected from discovery by the work product privilege.  Plaintiffs have failed to establish any substantial need for these materials.  In addition, Plaintiffs have not provided any evidence that the information in these reports would reveal anything relevant that they could not obtain from the materials UP has agreed to provide to Plaintiffs, or from some other source.  However, if the Court needs any additional explanation about the railroad's accident reports, UP could provide a pertinent sampling for the Court's *in camera* review.

### 2.    Claims Manuals and Investigation Guidelines.

Any version of UP's "accident investigation guidelines manual" or related documents exist for the sole purpose of guiding the process by which members of its claims department

investigate and handle claims that are likely to result in litigation, including those resulting from grade crossing collisions.  Such documents were prepared by and with the input and guidance of UP's attorneys, incorporating their mental impressions, and therefore constitute legal advice that is protected by the attorney-client privilege.

In Request No. 67, Plaintiffs are seeking the 2004 version of UP's "accident investigation guidelines manual," and every succeeding version of that manual.  Plaintiffs' claim that attorney-client/work product privilege would have no application to this Request because it "does not reveal communications between attorney and client" takes an excessively narrow view of when these privileges and protections apply.  *See* Doc. 43-3, at pp. 28-29.  These privileges and protections do not merely apply to actual communications.  And if such a manual does not represent "opinion work product," it would be difficult to imagine a scenario where such a designation *would* apply.

But these considerations are largely secondary, as the real issue here is whether a ten-year-old version of a claims manual that has not been used for approximately 10 years, and was not relied on in the present action, could have any possible relevance or bearing in the present action.  On its face, it would clearly not, and Plaintiffs have presented no argument or case law to support a contrary position.

### 3.      23 U.S.C. Section 409 Privileged Discovery.

Federal law limits the use of "reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 152 of this title or for the purpose of developing any highway safety

construction improvement project which may be implemented utilizing Federal-aid highway funds." 23 U.S.C. § 409.

23 U.S.C. § 409 provides, in its entirety:

> Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 152 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.

In *Robertson v. Union Pac. R.R. Co.*, 954 F.2d 1433, 1435 (8th Cir. 1992), the Eighth Circuit found that the purpose of section 409 is to "facilitate candor in administrative evaluations of highway safety hazards."  The interest to be served by such legislation is to allow the collection of information concerning the safety of roadways free from the fear of future tort actions.  As one court observed, "if a railroad knows that its candid efforts of persuasion directed to a local government that possesses discretionary authority may ultimately be used against it, the railroad will be far less forthcoming in offering any 'data' by which that discretion can be exercised, and indeed may choose not to offer safety suggestions at all."  *Rodenbeck v. Norfolk & Western Ry. Co.*, 982 F. Supp. 620, 624 (N.D. Ind. 1997).  The reports Plaintiffs seek in Requests Nos. 63 and 64 would clearly be encompassed by these protections as well.

## III.   CONCERNS SPECIFIC TO THE TRUE PURPOSE OF PLAINTIFFS' REQUEST FOR UP'S 2004 "ACCIDENT AND INVESTIGATION GUIDELINES MANUAL" AND CORRESPONDING REFERENCES TO *THE NEW YORK TIMES* ARTICLE

While admissibility is not the touchstone of discoverability, discovery requests must be reasonably calculated to lead to the discovery of admissible evidence.  Plaintiffs' Request No. 67

is not calculated to lead to the discovery of anything admissible or relevant to this case.  UP has

very real concerns that Plaintiffs' desire to obtain historical versions of its claims manual,

particularly as referenced in *The New York Times* article explicitly indicated in Request No. 67,

is not aimed at obtaining admissible evidence at all, but is merely designed to garner materials to

improperly disparage UP.  Even if these older versions of UP's claims manuals were determined

to be theoretically discoverable—which UP does not concede—the manuals and commentary

relating to their alleged contents would be inadmissible on numerous compelling grounds, and

therefore allowing their production here would simply impose an unfair and unnecessary burden

on UP with no corresponding benefit.

Therefore, in addition to the grounds for denying Plaintiffs' Motion to Compel outlined

above, Plaintiffs' Request No. 67 should further be denied as it is not calculated to lead to the

discovery of admissible evidence, but merely seeks support for inflammatory materials that

would themselves: (1) constitute inadmissible hearsay; (2) raise issues irrelevant to this case;

(3) introduce inadmissible character evidence; and (4) create unfair prejudice and bias.

**A.**     ***The New York Times* Article Is Inadmissible Hearsay That Cannot Be Used.**

**1.**     **Plaintiffs Cannot Use The Article as Proof of Matters Asserted Therein.**

Plaintiffs want UP's 2004 manual to bolster commentary relating to that 10-year-old

manual in *The New York Times* article.  But the article contains highly inflammatory opinions

and statements of other plaintiffs, their lawyers, and their expert witnesses.  The article thus is

classic hearsay — it contains out-of-court statements that Plaintiffs hope to use as proof of the

matters stated therein. Fed. R. Evid. 801(c) (defining hearsay).  Because it is hearsay, the article

would be inadmissible under the hearsay rule and would therefore be excluded.[4]  Fed. R. Evid.

---

[4]  Similar compilations of complaints and information remain inadmissible hearsay even when contained in

802; *see Finchum v. Ford Motor Co.*, 57 F.3d 526, 531-32 (7th Cir. 1995) (holding that article written by defendants' employee was inadmissible hearsay); *New England Mut. Life Ins. Co. v. Anderson*, 888 F.2d 646, 650 (10th Cir. 1989) (finding newspaper article about interview with the plaintiff was inadmissible hearsay); *Recreational Devel. Of Phoenix, Inc. v. City of Phoenix*, 220 F.Supp.2d 1054, 1059 n. 9 (D. Ariz. 2002) (holding statements made to author of magazine article were inadmissible hearsay); *Luque v. McLean*, 104 Cal. Rptr. 443, 451 (Cal. 1972) (holding that magazine articles and statistical surveys about lawn mower-caused injuries were inadmissible hearsay).

### 2.    The Article Is Not The Type Of Reliable Material On Which An Expert May Rely In Forming His Or Her Opinions.

Given the content of the article, moreover, Plaintiffs will not be able to circumvent the hearsay rule by claiming that their experts have relied on it and are entitled to refer to the article and comments therein when they explain the reasons for their opinions.  Experts do not have a license to rely on any sort of material they believe may bolster their opinions.  On the contrary, experts may rely upon and mention in their testimony only materials that other experts in the field reasonably rely upon in performing their professional duties.  *See* Fed. R. Evid. 702 (expert opinion must be based on "sufficient facts and data"), 703 (expert must rely on facts or data "of a type reasonably relied upon by experts in the particular field); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (holding that courts have a "gatekeeping" duty to prevent a jury from hearing unreliable expert testimony); *Kumho Tire Co. v. Carmichael*, 526

---

government reports.  *See, e.g., Bright v. Firestone Tire & Rubber Co.*, 756 F.2d 19, 21-23 (6th Cir. 1984) (excluding U.S. House of Representatives committee report that included complaints and related information about defective tire model); *Letting v. Mutha*, 58 P.3d 1049, 1053 (Colo. App. 2002) (affirming exclusion of administrative law judge's decision that summarized evidence but contained to factual findings).  The holdings of these cases apply with greater force here because *The New York Times* and other media companies are not government agencies.

U.S. 136 (1999) (holding that the *Daubert* rule applies to all types of expert testimony).  As many cases demonstrate, articles like this one fall well short of this standard of reliability.

To begin with, in cases such as this one, experts may not base their opinions on and discuss articles published in newspapers or popular magazines.  *Luque v. McLean*, 104 Cal.Rptr. 443, is a good example.  There, the plaintiff claimed that his expert should have been allowed to base his opinions on articles published in several magazines, including *Reader's Digest*, that discussed injuries caused by rotary lawn mowers.  *Id.* at 451.  The California Supreme Court rejected this contention.  Applying California's counterpart to Federal Rule of Evidence 703, the court held that "none of those periodicals constitute the type of professional technical literature" that experts in the field would rely upon.  *Id.* at 451-52; *accord Nichols v. Continental Airlines*, No. CIV. 01-232-B-S, 2002 WL 1724017, *2-4 (D. Me. 2002) (excluding expert's opinion testimony about airline seat configuration that was based on his personal experience and an article published in *Travel* magazine).

The article at issue here is indistinguishable from a *Reader's Digest* critique of lawn mowers, and the Court should treat it in the same way.  This was not carefully prepared professional literature about railroad crossings, but a newspaper opinion piece. *Recreational Devel. Of Phoenix, Inc.*, 220 F.Supp.2d at 1062-63 (finding award-winning investigative journalist did not become expert in field simply because he had written an article on issue relevant to case).  For this reason alone, Plaintiff's experts may not rely upon or discuss this article or its contents.

The article is also an impermissible basis for expert opinion because it is not, and does not purport to be, an objective investigation into any of the matters discussed.  The article relies on sources — litigants, their lawyers, and their experts — who provided "sound bite" statements

and have an indisputable interest in making UP look as bad as possible.  As the courts have routinely held, true experts do not rely on such obviously biased sources of information.  *See, e.g., In re TMI Litigation*, 193 F.3d 613, 697-98 (3rd Cir. 1999) (affirming ruling that excluded expert opinion based on medical summaries taken by employees of the plaintiffs' counsel rather than medical professionals); *Faries v. Atlas Truck Body Mfg. Co.*, 797 F.2d 619, 623-24 (8th Cir. 1986) (affirming exclusion of police accident report and expert opinion based on it where police officer did not perform a thorough investigation and relied on interested eyewitness); *Dallas & Mavis Forwarding Co., Inc. v. Stegall*, 659 F.2d 721, 722 (6th Cir. 1981) (reaching same conclusion under facts and holding similar to those in *Faries*); *Recreational Devel. of Phoenix, Inc.*, 220 F.Supp.2d at 1059-64 (excluding expert reports that were unreliable because of their reliance on anecdotal information and data provided by self-interested parties).

Finally, if Plaintiffs' experts could rely upon and discuss irrelevant comments regarding historical UP claims manuals, they would be doing little more than parroting the inadmissible hearsay contained in this article.  But this is not a proper role for experts.  In one case, for example, the court refused to allow a purported defense expert to testify about the amount of college basketball coaches' salaries based on information he had obtained through phone calls to college officials.  *Law v. National Collegiate Athletic Ass'n*, 185 F.R.D. 324, 341 (D. Kan. 1999).  As the Court put it, the defendant wanted to use the expert "as a channeler, seeking to present non-expert, otherwise inadmissible hearsay through the mouth of an economist."  *Id.  See also In re Rezulin Products Liability Lit.*, 309 F.Supp.2d 531, 538 (S.D.N.Y. 2004) (condemning practice of using experts "whose intended role is more to argue the client's cause than to bring to the fact-finder specialized knowledge or expertise"); *Stukenholtz v. Brown*, 679 N.W.2d 222, 225

(Neb. 2004) (stating that a "testifying expert may not merely act as a conduit for hearsay").  The same reasoning applies here.

      **B.**    ***The New York Times* Article Would Be Inadmissible Because It Is Not Relevant To Any Issue In This Case**

*The New York Times* article is not just hearsay; it is irrelevant to any of the issues to be tried in this case.  *See* Fed. R. Evid. 401 (defining concept of relevancy), 402 (stating that evidence that is not relevant is inadmissible).  "Evidence which has no probative value with respect to any issue, including credibility, is not admissible and the trial judge has the function and duty to exclude such evidence from the consideration of the jury."  *United States v. Higgins*, 362 F.2d 462, 464 (7th Cir. 1966).

Plaintiff wants to use this article, particularly its comments on UP's 2004 accident investigation manual, precisely because it would unfairly inflame the jury and evoke bias against UP.  But the mere fact that Plaintiffs believe this article would help them in their case does not make it relevant under any principled application of the law.

First, evidence about accidents that occurred at other crossings in other states, some of which did not even involve UP at all, would not help to prove any fact material to this case.  As discussed *supra,* even when other accidents have occurred **at the same crossing**, evidence about them is irrelevant unless they occurred under circumstances similar to those of the accident at issue.  *See, e.g., First Security Bank*, 152 F.3d at 879-80; *Kuper*, 290 N.W.2d at 909; *Cooper*, 563 S.W.2d at 236.  Because the article discusses accidents at crossings that are not involved here, the lack of similarity to the accident here is indisputable. And as UP has pointed out many times, the 2004 manual mentioned in this article has not been in use for approximately 10 years, and was not used to investigate the underlying accident.  This outdated manual and the article's comments relating to it are irrelevant for this reason alone.

25

Second, the article's implication that UP failed to preserve evidence about other accidents at other crossings likewise has no relevance to this case.  Because Plaintiffs have not claimed that UP failed to preserve evidence about this accident, evidence about what UP may have done in other cases has no logical relationship to the issues the jury must decide.  *See Simmons v. S. Pac. Transp. Co.*, 133 Cal. Rptr. 42, 55 (Ct. App. 1976) (holding that trial court should have excluded as irrelevant railroad claims agent's testimony that train crews were not supposed to speak with police unless agent was present or fill out accident reports; the crew had spoken with police even though no agent was present and had filled out accident reports).  Even if Plaintiffs later claim or insinuate that UP failed to preserve evidence about this accident, the pivotal question is what happened in this case. Any such evidence would not come into play unless Plaintiffs first identified the evidence UP employees supposedly failed to preserve, showed why it was material, and proved that UP employees willfully destroyed it.  *See Morris v. Union Pacific R.R. Co.*, 373 F.3d 896, 900-01 (8th Cir. 2004).   This they cannot do.  For this reason, evidence about what other UP employees did or did not do regarding other accidents logically does not prove that Plaintiff is entitled to admit this evidence here.  *See Simmons*, 133 Cal.Rptr. at 55.  And the same holds true for any prior version of UP's investigation manual.  In short, the article and its commentary relating to other accidents and outdated, out-of-use manuals are irrelevant and should be excluded for this reason as well.

**C.**    ***The New York Times* Article Amounts to Inadmissible Character Evidence.**

Even if Plaintiffs could — and they cannot — counter the foregoing hearsay and relevancy objections, their proposed use of UP's historic claims manuals and commentary relating thereto would be barred by the longstanding rule prohibiting character evidence.  *See* Fed. R. Evid. 404(a) (subject to limited exceptions, "[e]vidence of a person's character or a trait

of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion"). Character evidence is generally inadmissible because a jury would be tempted to base its decision on that evidence rather than the facts of the specific case before it. As the drafters of Rule 404 observed: "Character evidence is of slight probative value and may be very prejudicial. It tends to distract the trier of fact from the main question of what actually happened on the particular occasion." Fed. R. Evid. 404, Advisory Comm. Notes to 1972 Proposed Rules (quoting analysis of California Law Revision Comm'n).

Here, Plaintiffs would like to use these older manuals and article for this prohibited purpose. Were they allowed to do so, Plaintiffs would argue that UP is supposedly a "bad corporation" because it allegedly behaved improperly on other occasions. Then, Plaintiffs would implore the jury to find for them in this case because having behaved improperly before, UP must have behaved improperly here as well. That is precisely why the Court should deny Plaintiffs' request. By definition, evidence that shows a "propensity or proclivity to commit bad acts," or that generally depicts a "'defendant in a bad light,'" is inadmissible character evidence. *Coursen v. A.H. Robins Co., Inc.*, 764 F.2d 1329, 1335 (9th Cir. 1985) (affirming ruling excluding evidence defendant misrepresented product's efficacy in preventing pregnancy where issue was whether product had caused injuries unrelated to pregnancy); *see also Jones v. Southern P. Co.*, 962 F.2d 447, 449 (5th Cir. 1992) (affirming ruling excluding evidence that train engineer involved in crossing accident had been ticketed for safety infractions).

This article touches on just a small number of distinguishable, isolated, distant incidents and an outdated manual that has nothing to do with this case. This is nothing more than character evidence, which has no proper role in this action. Plaintiffs' Request is not calculated to lead to the discovery of admissible evidence. Because the manuals it seeks are irrelevant, and

the article Plaintiff cites would be inadmissible even if these manuals were found to be discoverable, Plaintiffs' request should be denied on these grounds as well.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion to Compel should be denied.

Respectfully submitted,

**YERETSKY & MAHER, L.L.C.**

By: /s/ Christopher C. Confer
    Gregory F. Maher      KS#11061
    Craig M. Leff        KS#16251
    Christopher C. Confer   KS#21419
Southcreek Office Park
7200 West 132nd Street, Suite 330
Overland Park, KS  66213
Telephone:  (913) 897-5813
Facsimile:  (913) 897-6468
**ATTORNEYS FOR DEFENDANTS**
**UNION PACIFIC CORPORATION AND**
**UNION PACIFIC RAILROAD COMPANY**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 28, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to the following:

Mr. George H. Pearson, III
Law Office of George H. Person, III
212 S.W. 8th Street, Suite 101
Topeka, KS  66603

Mr. Richard Sahadi
Wigington, Rumley, Dunn & Ritch, LLP
123 North Carrizo Street
Corpus Christi, TX  78401
**ATTORNEYS FOR PLAINTIFFS**

 /s/ Christopher C. Confer
Christopher C. Confer

S:\171\pldgs\Motion to Compel 2-14-14\mio mtn to compel- 3-25-14.doc