## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| MELISSA STONEBARGER, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF VERONICA HOGLE, DECEASED, KIATONA TURNER, AND THERMAN TURNER, JR., | ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | **Case No. 13-2137-JAR-TJJ** |
| vs. | ) ) | |
| UNION PACIFIC RAILROAD COMPANY, | ) ) ) | |
| **Defendant.** | ) ) ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Plaintiffs Kiatona Turner and Therman Turner, Jr. bring this wrongful death and survival action to recover damages arising from the collision between a Union Pacific train and a pickup truck operated by their father, Therman Turner.[1]  Melissa Stonebarger brings this action individually and as the Representative of the Estate of Veronica Hogle, to recover for the wrongful death and survival of her daughter, who was a passenger in Mr. Turner's vehicle.  The accident underlying this case occurred on October 29, 2012, at a railroad grade crossing in Brown County, near Hiawatha, Kansas. This matter is presently before the Court upon Defendant Union Pacific Railroad Company's ("Union Pacific") Motions for Summary Judgment 1) seeking dismissal of Plaintiffs' negligence claims on the grounds that they are either

---

[1]The original named Plaintiff was Ruth Turner, as Next Friend of K.T. a minor.  Kiatona Turner was substituted as the real party in interest after she turned eighteen.  Doc. 128.  Plaintiffs' Motion to add Ruth Turner in her individual capacity as the surviving spouse of Therman Turner and as Representative of the Estate of Therman Turner (Doc. 132) will be addressed in a separate order.

preempted by the Federal Railroad Safety Act, 49 U.S.C. § 20101, *et seq.* ("FRSA"), or otherwise fail as a matter of Kansas law (Doc. 83); 2) seeking dismissal of Plaintiffs' claims on the grounds that they are barred by the Kansas Statute of Repose, K.S.A. 60-513(b) (Doc. 85); and 3) seeking an order that Plaintiffs' survival claims fail as a matter of law (Doc. 87).[2]  For the reasons discussed in detail below, the Court grants in part Union Pacific's motion with respect to preemption of Plaintiffs' inadequate warning devices claim; denies the motion with respect to Plaintiffs' unusually dangerous/ultrahazardous crossing claim under Kansas law; denies the motion with respect to Union Pacific's statute of repose defense; and grants Union Pacific's motion with respect to Plaintiffs' claims for punitive damages based on their survival claims.

## I.   Summary Judgment Standard

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3]  A fact is only material under this standard if a dispute over it would affect the outcome of the suit.[4]  An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[5]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[6]

The moving party bears the initial burden of providing the court with the basis for the

---

[2]The Court will issue a separate order on Union Pacific's fourth Motion for Partial Summary Judgment (Doc. 89) on Plaintiff Melissa Stonebarger's claim for *Wentling* damages.

[3]Fed. R. Civ. P. 56(a).

[4]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[5]*Id.*

[6]*Id.* at 251–52.

motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[7]  When the moving party does not have the ultimate burden of persuasion at trial, it has both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.[8]  "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the non-moving party's claim, or by showing that the non-moving party does not have enough evidence to carry its burden of persuasion at trial."[9]

Conversely, if the moving party has the burden of proof, a more stringent summary judgment standard applies.  Where the movant bears the burden of proof on a claim or defense, to obtain summary judgment, it cannot force the nonmoving party to come forward with "specific facts showing there [is] a genuine issue for trial" merely by pointing to parts of the record that it believes illustrate the absence of a genuine issue of material fact.[10]  Instead, the moving party must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case.[11]  In this case, Union Pacific bears the burden on two affirmative defenses—preemption and statute of repose.

If the moving party properly supports its motion, the burden shifts to the non-moving

---

[7]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[8]*Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (citation omited).

[9]*Id.* (quoting *Trainor v. Appollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).

[10]*Id.* (citing *Mudrick v. Cross Servs., Inc.*, 200 F. App'x 338, 340 (5th Cir. 2006)) (citing *Celotex*, 477 U.S. at 323).

[11]*Id.*

party, "who may not rest upon the mere allegation or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial."[12]   In setting forward these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[13]   If the evidence offered in opposition to summary judgment is merely colorable or is not significantly probative, summary judgment may be granted.[14]   A party opposing summary judgment "cannot rely on ignorance of the facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial."[15]   Put simply, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts."[16]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[17]

## II.   Evidentiary Objections

The parties have objected to the admissibility of certain evidence submitted in support of summary judgment.   The Court addresses them at this time.

---

[12]*Muck v. United States*, 3 F.3d 1378, 1380 (10th Cir. 1993).

[13]*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

[14]*Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 533 (10th Cir. 1994).

[15]*Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir. 1998), *aff'd*, 939 F.2d 910 (10th Cir. 1991).

[16]*Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

[17]*Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

### A.      Objections to Affidavits Offered by Union Pacific

Plaintiffs object to the affidavits of Albert Cathcart and Paul Fulsom on the grounds that they are not based on personal knowledge and are thus inadmissible under Fed. R. Evid. 602. Rule 602 requires that a testifying witness "ha[ve] personal knowledge of the matter" testified to.[18]  Also, Fed. R. Civ. P. 56(c) requires that affidavits be made on personal knowledge and "set forth such facts as would be admissible in evidence. . . . The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits." "Under the personal knowledge standard, an affidavit is inadmissible if 'the witness could not have actually perceived or observed that which he testifies to.'"[19]  Statements of "mere belief in an affidavit must be disregarded."[20]

Plaintiffs object to the affidavit of Albert Cathcart, who was employed by the Kansas Department of Transportation ("KDOT"),[21] and Paul Fulsom, a private contractor.[22]  Plaintiffs urge that Cathcart and Fulsom lack personal knowledge of the work done on the particular subject crossing at issue in this case, and that their testimony is based on merely looking at documents.

Rule 602 recognizes that the personal knowledge requirement can be provided by the witness himself, stating "[e]vidence to prove personal knowledge may consist of the witness's

---

[18]Fed. R. Evid. 602.

[19]*Argo v. Blue Cross Blue Shield*, 452 F.3d 1193, 1200 (10th Cir. 2006).

[20]*Id.* (quoting *Tavery v. United States*, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)).

[21]Doc. 84, Ex. C.

[22]*Id.*, Ex. D.

own testimony."[23]  Here, both witnesses attest that they have "personal knowledge of the matters set forth in [their] Declaration[s] and [were] competent to testify thereto."  "Rule 56[(c)]'s "requirements of personal knowledge and competence to testify may also be inferred if it is clear from the context of the affidavit that the affiant is testifying from personal knowledge."[24]  Here, it is clear from the context of the declarations that both Cathcart and Fulsom are competent to testify to the matters discussed in their respective declarations.

Cathcart was a long time KDOT employee, and responsible for administering projects and maintaining KDOT's project files regarding federally funded highway-railroad grade crossing sign placement projects for the State of Kansas.  In the early 1990's, KDOT undertook Project 106 X-1922-01 ("the Project"), which used federal funds to install new reflectorized crossbucks and advance warning signs at various railroad grade crossings in several counties in Kansas, including Brown County.  Cathcart was the Coordinating Engineer for the Project. Fulsom was the project superintendent for the private contractor that was awarded work done on the Project, Paul J. Fulsom, Inc., and "was personally involved with this work and was present at the locations where this work was performed."  The Court finds that personal knowledge of the subject matter attested to can be inferred based on the declarants' respective positions with KDOT and Paul J. Fulsom, Inc.  Further, the statements made in both declarations are particular and detailed, which further supports their attestations of personal knowledge.[25]  Plaintiffs'

_____

[23]Fed. R. Evid. 602.

[24]*Told v. Tig Premier Ins. Co.*, 149 F. App'x 722, 725 (10th Cir. 2005) (citing *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990)).

[25]A finding that these declarants lack personal knowledge is made more difficult by the generalized allegations made in response to Union Pacific's statement of uncontroverted facts.  As Union Pacific notes, Plaintiffs sought and were granted an extension of time to respond to the motion for summary judgment in order to depose the witnesses who provided affidavits in support thereof.  Doc. 114.  Plaintiffs did not depose Cathcart or Fulsom, and

objections are overruled.

**B.      Objection to Expert Report of James Loumiet**

Union Pacific objects to the consideration of James Loumiet's unsworn expert report to avoid summary judgment.  Although Mr. Loumiet executed a separate affidavit summarily stating his opinion on the sight-restrictions, it does not verify or incorporate his expert report.[26] This court has repeatedly emphasized that, when tested at summary judgment, the proponent of expert testimony may not simply present the unsworn report of the proposed expert.[27]  Plaintiffs' failure is compounded by their failure to include this evidence in a separate statement of additional facts, as discussed below.  Nevertheless, Mr. Loumiet's unverified report is cited in Union Pacific's statement of uncontroverted facts and attached to its memorandum in support of summary judgment.[28]  Rule 56(c) states that "[a] party may object that the material cited to support or dispute a fact must be presented in a form that would be admissible in evidence."[29] There is no dispute at this point that the facts contained within the expert report could be reduced to admissible evidence at trial, since at this point there have been no *Daubert* motions filed and Mr. Loumiet would presumably testify at trial; Rule 56(c) states that the objection is proper only

merely assert general objections asserting lack of personal knowledge.

[26]Doc. 137, Ex. F.

[27]*See Ho v. Michelin N. Am., Inc.*, No. 08-1282-JTM, 2011 WL 3241466, at *13 (D. Kan. July 29, 2011), *aff'd*, 520 F. App'x 658 (10th Cir. 2013) (citing *Hildebrand v. Sunbeam Prods.*, 396 F. Supp. 2d 1241, 1250 (D. Kan. 2005)).

[28]Doc. 84 at  ¶¶ 65, 85, Ex. J.

[29]Fed. R. Civ. P. 56(c)(1)(B)(2).

when the facts cannot be presented in an admissible form.[30]  Accordingly, the Court will consider Mr. Loumiet's expert report on summary judgment.

## III.    Uncontroverted Facts

Before reaching the uncontroverted facts, the Court addresses Plaintiffs' failure to comply with the local rule for summary judgment responses, which requires: "if the party opposing summary judgment relies on any facts not contained in the movant's memorandum, that party shall set forth each additional fact in a separately numbered paragraph, supported by references to the record, in the manner required by subsection (a), above."[31]  As noted by Union Pacific, Plaintiffs have included numerous factual matters that they claim create a genuine issue of material fact, but do not set forth any statement of additional facts in the manner required by the rule.  Instead of setting forth the additional facts in separately numbered paragraphs, supported by references to the record, Plaintiffs refer to the evidence in the argument portion of their response brief.  Under D. Kan. Rule 56.1(b)(2), the Court considers only those facts that the parties include in their statement of facts, in numbered paragraphs with proper record citation and support.[32]  The Court does not consider facts that the parties discuss only in the argument

---

[30]*See Stephens v. Broward Sheriff's Office*, No. 13-60349, 2014 WL 6997623, at *4 n.6 (S.D. Fla. Dec. 10, 2014) (overruling objection to unverified expert report submitted in opposition to summary judgment where defendant attached the report to its motion to strike that report); Fed. R. Civ. P. 26(a)(2)(B) (requiring disclosures of certain expert witnesses to be accompanied by a written report that contains, *inter alia*, "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming [the opinions]").

[31]D. Kan. Rule 56.1(b)(2).

[32]*See Am. Family Mut. Ins. Co. v. Techtronic Indus. N. Am., Inc.*, No. 12-2609-KHV, 2014 WL 2040158, at *2 n.4 (D. Kan. May 16, 2014) (citing cases).

section of their briefs and not in the statement of facts.[33]

The following facts are either uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiffs, the non-moving parties.

On October 29, 2012, at approximately 9:55 a.m., Therman Turner was driving a 1999 Ford F-150 east on 260th Road in Hiawatha, Kansas.  Veronica Hogle was a passenger in the truck.  As Turner drove the truck east over the 260th Road railroad crossing, DOT Crossing No. 814-762E ("the Crossing"), it was struck by a Union Pacific train that was traveling north.  Both Therman and Hogle were pronounced dead at the scene of the crash.

### *Warning Devices*

On the date of the accident, two Union Pacific Claims Representatives, Clint Pebsworth and William Herring, responded to and investigated the accident.  As part of their investigation, the Claims Representatives took measurements and photographs at the scene.[34]  Two reflectorized crossbuck signs were located at the Crossing, one at the southwest corner, the other

---

[33]*Id.*; *see Jones v. Unified Gov't of Wyandotte Cnty./Kansas City, Kan.*, 552 F. Supp. 2d 1258, 1261 n.1 (D. Kan. 2008).  The Court further notes that the procedural posture of the case is not ideal.  The Pretrial Order was entered nearly three months after the original deadline, at the request of the parties.  Although Union Pacific filed its motions for summary judgment by the dispositive motions and discovery deadlines, the parties deferred the depositions of eight witnesses, including the parties' experts, until December 31, 2014, while the parties pursued settlement.  To date, it appears the only expert that has been deposed is Mr. Loumiet, who was deposed on November 21, 2014, after Plaintiffs filed their response to the motion for summary judgment; the depositions of Union Pacific's experts have been postponed pending resolution of Union Pacific's request for review of a discovery matter that Plaintiffs contend is key to the depositions.  The parties have also agreed that motions to exclude or limit testimony of experts will be filed by January 15, 2015.  Trial is currently scheduled to begin April 27, 2015.  That being said, Union Pacific does not rely on any expert testimony or evidence in support of its motions, nor do Plaintiffs invoke Fed. R. Civ. P. 56(d), and the Court proceeds to analyze Union Pacific's motions on the record before it, such that it is.

[34]Doc. 84, Exs. 1–4 of  Ex. B.

9

at the northeast corner.[35]  The series of photographs were taken while positioned 50, 25, and 15 feet west of the near rail at the crossing, with the camera facing south.  Shown in the photographs at 25 feet is an approaching freight train and a railroad crossbuck sign.  The photographs also depict the trees and other brush that existed at the time of the accident.  Stephen Spare owns the property adjacent to the southwest quadrant of the crossing.

From 1970 until his retirement in 2008, Albert D. Cathcart was employed by KDOT.[36] Cathcart's work at KDOT included working in the position of Coordinating Engineer for KDOT's Bureau of Design from 1994 to 2008.  Cathcart was responsible for administering projects and maintaining KDOT's project files regarding federally funded highway-railroad grade crossing sign placement projects for the State of Kansas.  In the early 1990's, KDOT undertook Project 106 X-1922-01 ("the Project"), which used federal funds to install new reflectorized crossbucks and advance warning signs at various Northeast Kansas & Missouri Railroad Company ("NEKM") railroad grade crossings in several counties in Kansas, including Brown County.  Cathcart was the Coordinating Engineer for the Project.

The KDOT Plan of Proposed Railroad Crossing Signing–Federal Aid Project document for the Project ("the Plan") contains a table that identifies each of the NEKM crossings within Brown County, Kansas, at which warning devices were to be installed under the Project and for each crossing identified, the specific type and number of warning devices to be installed.[37]  The

---

[35]Crossbucks are "black-and-white, x-shaped signs that read 'RAILROAD CROSSING.'" *See Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1211 n.4 (10th Cir. 2008) (quoting *Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 350 (2000)).

[36]Doc. 84, Ex. C.

[37]*Id.*, Ex. 2.

Crossing was to receive two reflectorized crossbuck signs and two advance warning signs as part of the Project.[38]  KDOT bid out the work of placing the reflectorized railroad crossbuck signs and advance warning signs called for in the Project to private contractors.  The private contracting company that won the bid for this work was Paul J. Fulsom, Inc.[39]  Paul J. Fulsom, Inc. completed the work for the Project, including the work in Brown County, Kansas, in accordance with the Plan and specifications for the Project in a satisfactory manner and in compliance with all applicable Federal and State rules and regulations on or before June 10, 1997, and KDOT accepted and approved the work performed by Paul J. Fulsom, Inc. on or before July 10, 1997.[40]  KDOT paid Paul J. Fulsom, Inc. in full for all work performed as part of the Project, and all work was complete and approved on or before August 1, 1997.

FHWA Project STP X192-(201) is the Federal Highway Administration ("FWHA") designation for KDOT Project 106 X-1922-01.  The Federal government funded 80% of the Project's costs for railroad right-of-way sign installation, i.e., reflectorized crossbuck signs, for FWHA Project STP X192-(201); the railroad funded the remaining 20% of costs.  The Federal government funded 100% of the cost of the Project's costs for installing advance warning signs. In other words, 80% of the costs of installing each reflectorized crossbuck sign at each crossing that was included in FWHA Project STP X192-(201) and/or the KDOT Project was paid for with Federal government money.  The Federal government did not pay for the installation of reflectorized crossbuck signs at 80% of the crossings included in the Project, nor did the railroad

---

[38]*Id*. at 7.

[39]*Id*., Ex. 4.

[40]*Id*., Exs. 3, 5, 6.

pay for 20% of the crossings included in the Project.  KDOT did not attempt to apportion the funding of grade crossing improvements in a manner that allocated 100% of federal funds for the improvement of 80% of the crossings within a specified crossbuck upgrade project, with the remaining 20% of the crossings funded entirely by the railroads.

Several sections of track and the railroad grade crossings that intersected that trackage, which were formerly owned by the NEKM, were purchased by Union Pacific in 1999.  The former NEKM trackage and Crossing at issue in this case was included in that 1999 purchase.

Paul Fulsom was the project superintendent for a construction company known as Paul J. Fulsom, Inc.[41]  Paul J. Fulsom, Inc. was selected by KDOT through a bid process to perform the work called for in the KDOT Project.  As project superintendent, Paul Fulsom personally managed and oversaw the work done by Paul J. Fulsom, Inc. on the Project.  As part of the Project, Paul J. Fulsom, Inc. placed reflectorized crossbuck and advance warning signs at public grade crossings in Brown County, Kansas, unless these public grade crossings were already signalized with electronic signals, i.e., flashing lights and crossing gates.  The work of Paul J. Fulsom, Inc. for the Project included the removal of existing crossbucks at public grade crossings along NEKM railroad tracks in various counties in the State of Kansas, and the installation of new reflectorized crossbucks for those public grade crossings.  Pursuant to its contract with KDOT regarding the Project, Paul J. Fulsom, Inc. placed reflectorized crossbucks and advance warning signs at the railroad grade crossing that intersects 260th Road in Brown County, Kansas, known as DOT Crossing No. 814-762E, on or before June 10, 1997.[42]  Fulsom

---

[41]Doc. 84, Ex. D.

[42]*Id.*, Ex. 1.

attests that he was personally involved with this work and was present at the locations where this work was performed and that the reflectorized crossbucks shown in photographs taken shortly after the October 29, 2012 accident are the same type as those that were installed by his company through the Project.

### Train Horn

A post-accident horn test found the decibel output at an average of 99.0 decibels, which is above the Federal Railroad Administration ("FRA") minimum of 96 decibels. Plaintiffs' expert, James Loumiet, opines that the locomotive horn was sounded approximately 13.7 seconds before impact with Mr. Turner's truck.

### Track and Train Speed

Zebulon Kreifels is a Manager of Track Maintenance for Union Pacific, a position he has held since January 2011. Kreifels holds a certification as a qualified track inspector pursuant to 49 C.F.R. § 213.7, and he held this certification in October 2012. Kreifels was the Manager of Track Maintenance for the territory that included the crossing at issue in this case at the time of the accident. In that capacity, Kreifels was responsible for ensuring that regular inspections of the railroad track were conducted to ensure whether the track complied with the safety standards imposed by the FRA as found in 49 C.F.R. Part 213. At the time of the accident, the track that went through the crossing had been designated by Union Pacific as Class 4 track under the FRA track safety standards, 49 C.F.R. § 213, and met all requirements for Class 4 track.

On and before October 29, 2012, the maximum track speed for Class 4 track is and was 60 miles per hour. The Event Recorder for the lead locomotive and the Track Image Recorder ("TIR") from the lead locomotive show that the train was traveling approximately 41 miles per

hour in its immediate approach to the crossing and shortly before the accident.

Ruth Turner, Mr. Turner's ex-wife and mother of Kiatona Turner and Therman Turner, Jr., testified that he had driven and traveled over the subject crossing in both directions, east bound and west bound, on occasions prior to the date of the accident.  Ms. Turner testified that she was unaware of any changes at or near the Crossing within the ten years preceding the accident in 2012, including changes to the signage, the conditions, or the vegetation in the quadrants and the terrain at or adjacent to the crossing.  Melissa Stonebarger, Veronica Hogle's mother, offered similar testimony

## IV.   Discussion

Union Pacific seeks summary judgment on Plaintiffs' claims that allege Union Pacific was negligent because 1) it failed to install adequate warning devices; 2) the crossing was unusually dangerous or ultra hazardous; 3) the train was traveling at an excessive speed; 4) Union Pacific failed to properly sound the train's horn or other audible warning devices; 5) the train crew failed to keep a proper lookout and negligently failed to slacken speed; 6) Union Pacific failed to clear its right-of-way of vegetation; and 7) the train sounded a "short" horn. Union Pacific argues further that 1) Therman Turner's negligence was the sole cause of the accident; 2) Plaintiffs' claim is time-barred by the statute of repose; and 3) Plaintiffs are not entitled to an award of punitive damages.  In their responses, Plaintiffs stipulated to drop, acquiesce and/or not pursue any survival claim as well as three negligence claims: 1) that the train was traveling at excessive speed; 2) that the train crew failed to keep a proper lookout and negligently failed to slacken speed; and 3) that the train crew failed to sound an emergency horn. Plaintiffs did not respond to Union Pacific's argument regarding train horn audibility.  The Court

grants Union Pacific summary judgment on these claims.

### A.    Federal Preemption

Union Pacific contends that federal regulations preempt Plaintiffs' inadequate warning device and unusually dangerous/ultrahazardous crossing claims under the FRSA preemption provision.[43]   The Supremacy Clause of the United States Constitution is the source of preemption.[44]   Under the Supremacy Clause, federal law trumps or preempts state law whenever the two are in conflict.   "Preemption can be express or implied—either way, the effect is the same: preemption renders the relevant state law invalid."[45]

The FRSA expressly preempts state railroad law.   Subsection (a) of the FRSA preemption provision, 49 U.S.C. § 20106, outlines the scope of FRSA preemption: "Laws, regulations, and other orders related to railroad safety . . . shall be nationally uniform to the extent practicable."[46]   The FRSA does not preempt all railroad law: "A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement."[47]   Moreover, states may adopt a "more stringent law" if it is necessary to eliminate a "local safety or security hazard."[48]   As the Supreme Court has noted, the

---

[43]49 U.S.C. § 20106.

[44]U.S. Const. art. VI, cl. 2.

[45]*Zimmerman v. Norfolk S. Corp.*, 706 F.3d 170, 176 (3d Cir. 2013) (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992)).

[46]49 U.S.C. § 20106(a)(1).

[47]*Id*. § 20106(a)(2).

[48]*Id*. § 20106(a)(2)(A).

FRSA "displays considerable solicitude for state law."[49]

Before 2007, courts held that a federal regulation preempts state law under subsection (a) if the regulation "substantially subsume[s] the subject matter of the relevant state law."[50]  The regulation must do more than simply "touch upon or relate to [the] subject matter" of the state law.[51]  Congress amended the FRSA provision in 2007 by adding subsection (b), which is a "[c]larification regarding State law causes of action":

> (1) Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damages alleging that a party—
>
> (A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation . . . or the Secretary of Homeland Security . . . , covering the subject matter as provided in subsection (a) of this section;
>
> (B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or
>
> (C) has failed to comply with a State law, regulation, or order that is not compatible with subsection (a)(2).[52]

The 2007 amendment did not, however, change the language of subsection (a), and clarified the regulation to solve an ambiguity, rather than to change substantive law.[53]  Instead,

---

[49]*CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 665 (1993); *see also Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 352–54 (2000).

[50]*Easterwood*, 507 U.S. at 664.

[51]*Id.* (internal quotation marks omitted).

[52]49 U.S.C. § 20106(b)(1).

[53]*Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1216 (10th Cir. 2008).

16

the amendment preserves cases such as *Norfolk Southern Railway Co. v. Shanklin*,[54] in which the Supreme Court analyzed whether a regulation covers state law.[55]  "The amendment . . . clarifies that even when a regulation covers the subject matter of a claim, the claim can avoid preemption if the railroad violated a federal standard of care or its internal rule."[56]

The preemption analysis under the amended FRSA requires a two-step process.  First, the court "asks whether the defendant allegedly violated either a federal standard of care or an internal rule that was created pursuant to a federal regulation.  If so, the plaintiff's claim avoids preemption."[57]  If not, the court proceeds to the second step and "ask[s] whether any federal regulation covers the plaintiff's claim.[58]  "A regulation covers—and thus preempts—the plaintiff's claim if it 'substantially subsume[s] the subject matter of that claim,'" relying on precedent including cases that predate the 2007 amendment.[59]

### 1.    Adequacy of Warning Devices

Plaintiffs first claim that Union Pacific failed to comply with a federal standard of care established by a regulation.  Specifically, the Federal Highway Administration ("FHA") has enacted regulations establishing what constitutes an adequate warning device for projects installed with federal funds. 23 C.F.R. § 646.214(b)(3) and (4) set forth guidelines for selecting the appropriate warning devices for installation at grade crossings improved with federal

---

[54]529 U.S. 344 (2000).

[55]*Zimmerman*, 706 F.3d at 177.

[56]*Id.* (citing 49 U.S.C. § 20106(b)(1)(A)–(B)).

[57]*Id.*

[58]*Id.* (citing 49 U.S.C. § 20106(a)(2)).

[59]*Id.* (citing *Henning*, 530 F.3d at 1216; *Grade v. BNSF Ry. Co.*, 676 F.3d 680, 686 (8th Cir. 2012)).

funding:

> (3) Adequate warning devices, under § 646.214(b)(2) or on any
> project where Federal-aid funds participate in the installation of
> the devices are to include automatic gates with flashing light
> signals when one or more of the following conditions exist:
>
> (A) Multiple main line railroad tracks.
>
> (B) Multiple tracks at or in the vicinity of the crossing which may
> be occupied by a train or locomotive so as to obscure the
> movement of another train approaching the crossing.
>
> (C) High Speed train operation combined with limited sight
> distance at either single or multiple track crossings.
>
> (D) A combination of high speeds and moderately high volumes of
> highway and railroad traffic.
>
> (E) Either a high volume of vehicular traffic, high number of train
> movements, substantial numbers of schoolbuses or trucks carrying
> hazardous materials, unusually restricted sight distance, continuing
> accident occurrences, or any combination of these conditions.
>
> (F) A diagnostic team recommends them.
>
> (ii) In individual cases where a diagnostic team justifies that gates
> are not appropriate, FHWA may find that the above requirements
> are not applicable.
>
> (4) For crossings where the requirements of § 646.214(b)(3) are
> not applicable, the type of warning device to be installed, whether
> the determination is made by a State regulatory agency, State
> highway agency, and/or the railroad, is subject to the approval of
> FHWA.[60]

The Supreme Court in *Shanklin* held that by virtue of the FRSA, these regulations

preempt state law tort claims challenging the adequacy of warning devices that are installed in

---

[60]23 C.F.R. § 646.214(b).

part with federal funds.[61]  Plaintiffs contend that Union Pacific has failed to establish that the warning devices were installed with federal funds.  Plaintiffs base this argument on allegations that Union Pacific's exhibits and records provide no specific individualized information on the Crossing in this case.  Plaintiffs argue that Cathcart and Fulsom have no personal knowledge and cannot tell from their records whether the crossbucks and advance warning signs were installed at the Crossing as part of the Project.  Plaintiffs assert that the KDOT Plans that allow crossbucks that are in compliance with the Plans to remain raises a fact question whether the specific crossbucks on the Crossing were replaced as part of the Program, or left alone because they complied with the replacement signage.  The Court disagrees.

Union Pacific has presented evidence showing that federal funds were expended on the upgrading or installation of reflectorized crossbucks and advance warning signs in various Kansas counties, including Brown County, and that funding was for 100% of the crossings that were upgraded.  The affidavit of Cathcart and the KDOT records reveal that Crossing No. 814-762E is located in Hiawatha, Kansas, in Brown County.  The KDOT Plans show the specific Brown County railroad crossings and the equipment and upgrades included for each crossing. All of the crossings listed in Brown County were to be upgraded with reflectorized crossbucks and 36" diameter advance warning signs; Crossing 814-762E was to receive two of each.[62]  The affidavit of Fulsom reveals that his construction company was awarded the bid to perform the work as outlined in the KDOT plans, that he personally oversaw the work that Paul J. Fulsom, Inc. did on the Project, and that his company placed the reflectorized crossbucks and advance

---

[61]529 U.S. at 344.

[62]Doc. 84, Ex. C at 15.

warning signs on the Crossing on or before June 19, 1997.  Fulsom attests that he was personally involved with the work on the Project, was present at the locations where this work was performed, and that the photographs from the Crossing on the date of the accident show crossbucks that are the same type as those his company installed as part of the Project.  The photographs of the crossbucks at the Crossing show reflectorized tape attached to the support posts of the crossbucks.  Plaintiffs, however, do not present any evidence to create an issue of genuine material fact with regard to the participation of federal funds in the installation of the warning devices at the Crossing at issue in this case.  The Court concludes that federal funds did participate.[63]

Plaintiffs further contend that their claims are not preempted because Union Pacific violated the provisions in 23 C.F.R. § 646.214(b)(3) that require automatic gates and flashing lights because the crossing condition included 1) unusually restricted sight distance; 2) continuing accident occurrences; and 3) a diagnostic team recommendation.  Again, the Court disagrees.  The Tenth, Eighth and Third Circuits have rejected a similar argument that subsection (b)(3) creates a federal standard of care that requires Union Pacific to install automatic gates and flashing lights.[64]  Subsection (b)(3) does not impose on railroads an ongoing duty—instead, it "displace[s] state and private decisionmaking authority."[65]  "More importantly, subsection (b)(3)

---

[63]*See McDaniel v. S. Pac. Transp.*, 932 F. Supp. 163, 167 (N.D. Tex. 1995) (discussing evidence necessary to prove federal funds participated in the upgrading of warning signs at railroad crossings).

[64]*See Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1215 (10th Cir. 2008) (concluding that 23 C.F.R. § 646.214(b)(3) and (4) preempt claims against railroads for installing inadequate warning devices at railroad crossings); *Zimmerman v. Norfolk S. Corp.*, 707 F.3d 170, 192–94 (3d Cir. 2013) (concluding subsection (b)(3) does not impose on railroad a federal standard of care, and thus inadequate-device claim is preempted); *Grade v. BNSF Ry. Co.*, 676 F.3d 680, 686–87(8th Cir. 2012) (same).

[65]*Henning*, 530 F.3d at 1212 (quoting *Easterwood*, 507 U.S. at 670) (internal quotation marks omitted).

'place[s] the responsibility for implementing adequate warning devices on the State, thereby preempting any cause of action alleging a railroad failed to properly install an adequate warning device.'"[66] Railroads cannot, "as a matter of law, fail to comply" with subsection (b)(3).[67]

In this case, KDOT installed crossbucks and advance warning signs at the subject crossing with the use of federal funds and the help of NEKM, the crossing's previous owner. While Union Pacific, as the current owner, has a duty to maintain the crossing devices, the State of Kansas is ultimately responsible for ensuring that the devices comply with subsection (b)(3).[68] As a result, subsection (b)(3) does not impose on Union Pacific a federal standard of care.[69] Absent a federal standard, Plaintiffs can avoid preemption only if there are no federal regulations that cover the subject matter of their inadequate-device claim.[70] The Supreme Court, however, has concluded that subsections (b)(3) and (4) cover the subject matter of such claims.[71] Accordingly, Plaintiffs' inadequate warning devices claim is preempted, and the Court grants Union Pacific summary judgment on this claim.

### 2.     Unusually Dangerous or Ultrahazardous Crossing

Union Pacific argues that subsection (b)(3) and (4) also preempt Plaintiffs' claim that the Crossing was unusually dangerous or ultrahazardous because of sight-restricting trees and vegetation. To the extent that Plaintiffs claim that the presence of vegetation or trees rendered

---

[66]*Zimmerman*, 706 F.3d at 192 (quoting *Grade*, 676 F.3d at 686).

[67]*Henning*, 530 F.3d at 1215.

[68]*Zimmerman*, 706 F.3d at 192 (citing *Strozyk v. Norfolk S. Corp.*, 358 F.3d 268, 276 (3d Cir. 2004)).

[69]*Id.*

[70]49 U.S. C. § 20106(a)(2).

[71]*See Shanklin*, 529 U.S. at 352–53; *Easterwood*, 507 U.S. at 670.

the Crossing sight-restricted and ultrahazardous, thus requiring warning devices beyond the

crossbucks and advance warning signs, Union Pacific is correct—such a claim is an attack on the

adequacy of the warning devices present at the Crossing, as discussed above.  However,

Plaintiffs also claim that the Crossing was rendered ultrahazardous due to Union Pacific's failure

to clear sight-restricting vegetation from its right-of-way and adjacent property: "Kansas law is

clear [Union Pacific] had every obligation to reduce or eliminate brush or sight obstructions to

ensure a safe crossing."[72]  To the extent this obstructed view claim is unrelated to the warning

devices, it is not preempted by subsections (b)(3) and (4).[73]  Thus, the Court will address Union

Pacific's argument that this negligence claim fails as a matter of law.

Kansas law imposes upon a railroad the duty to maintain safe grade crossings.  In 1939,

the Kansas Supreme Court noted: "It is the general rule that when a train is rightfully on a

crossing and [a] motor vehicle is driven into it, with resulting damages, the sole cause of such

damages is the fact that the driver of the motor vehicle drove it into the train."[74]  The railroad has

a right to make reasonable use of a crossing, and, ordinarily, the presence of a train on a railroad

crossing is of itself an adequate warning to the driver of a vehicle on a highway, and special

safeguards need not be employed in the absence of unusual surroundings, conditions, and

---

[72]Pretrial Order, Doc. 120 at 7.

[73]*See Strozyk*, 358 F.3d at 273–77 (holding preemption does not eclipse any duty "ensuring safe grade crossings that are unrelated to warning devices, such as the duty to keep visibility at grade crossings free from obstructions").  Union Pacific does not argue that Plaintiffs' claim is preempted by 49 C.F.R. § 213.37, which requires a railroad to control vegetation on its property "on or immediately adjacent to roadbed."  *See Anderson v. Wisc. Cent. Transp. Co.*, 327 F. Supp. 2d 969, 979–80 (E.D. Wisc. 2004) (holding plaintiff's claim that railroad was negligent by failing to comply with state law requiring railroads to cut vegetation is not preempted by 49 C.F.R. § 213.37 because plaintiff claimed that railroad was negligent by failing to trim vegetation up to 330 feet from roadbed).

[74]*Bledsoe v. M.-K.-T. R.R. Co.*, 90 P.2d 9, 14 (Kan. 1939).

circumstances.[75]   This rule has been modified and Kansas now recognizes that "unusually

dangerous conditions" can exist where "mere presence of the train on the crossing may not

adequately warn users of the highway of the danger in time to avoid a collision."[76]   The critical

factor is whether "the motorists' perceptibility of the train occupying the crossing is substantially

impaired through no fault of their own."[77]   "Where a crossing is unusually dangerous, such

reasonable care must be exercised by the railroad as common prudence dictates.   Under these

circumstances, where a train occupies a crossing, the railroad is under a duty to use reasonable

means to warn and avoid injury to the traveling public."[78]   "The character of the means will

depend on the particular conditions and circumstances surrounding the crossing."[79]   Where

obstructions to view exist the precautions necessary may take the form either of lower speed or

commensurate warnings such as a flagman.[80]   Whether a railroad crossing is more than ordinarily

dangerous is generally a question of fact, although the sufficiency of the evidence to establish

that fact remains a question of law.[81]

        Plaintiffs contend that had the trees and vegetation been cleared or the line of sight

adequate, the accident would not have occurred.   Plaintiffs argue that "[w]hether vegetation

existed in the immediate right of way or not, [Union Pacific] holds a duty to keep the crossing

---

[75]*Waits v. St. Louis-San Francisco Ry. Co.*, 531 P.2d 22, 29 (Kan. 1975).

[76]*Id*. at 31.

[77]*Id.*

[78]*Saliba v. Union Pac. R.R. Co.*, 955 P.2d 1189, 1193 (Kan. 1998).

[79]*Id.*

[80]*Sexsmith v. Union Pac. R.R. Co.*, 495 P.2d 930, 937 (Kan. 1998).

[81]*Saliba*, 955 P.2d at 1193 (citing *Jennings v. Mo. Pac. R. Co.*, 506 P.2d 1125 (1973)); *Sexsmith*, 495 P.2d at 930).

safe and eliminate unusually dangerous conditions."  Plaintiffs offer as support the expert report

of James R. Loumiet, in which he states that the Crossing had "unusually restricted sight

distance in all four crossing quadrants due to trees and vegetation in the quadrants."[82]

Citing the *Railroad-Highway Grade Crossing Handbook*, published by the FHWA, and *A*

*Policy on Geometric Design of Highways and Streets*, published by the American Association of

State Highway and Transportation Officials, Mr. Loumiet states that in order to provide drivers

with adequate track sight distance at a crossing, clear unobstructed sight triangles must be

provided in all four quadrants.[83]  His analysis using the formula for a 55-mph roadway speed

limit indicates that the crossing in this case needed to provide motorists at least 470 feet of track

sight distance when viewed from a location 570 feet from the tracks on the roadway.[84]  In this

case, actual site distance to the south from 570 feet west of the tracks on the roadway, *i.e.*, the

approaches for the subject pickup truck and train, was only about 20–25 feet down the tracks.[85]

Using the formula for a 20-mph roadway, the crossing needed to provide motorists at least 325

feet of track sight distance when viewed from a location 130 feet from the tracks on the roadway,

and in this case the actual track sight distance was about 80 feet.[86]  Mr. Loumiet opined that the

trees and vegetation in the quadrants were a factor that rendered the Crossing "very sight

---

[82]Doc. 84, Ex. J.  Plaintiffs also offer as evidence photographs of lights and gates being installed at the Crossing after the accident, and a news article about an agreement to upgrade the crossing.  As noted, under D. Kan. Rule 56.1, the Court does not consider facts that the parties discuss only in the argument section of their briefs and not in the statement of facts.

[83]Doc. 84, Ex. J at 5.

[84]*Id.* at 5–6.

[85]*Id.* at 6.

[86]*Id.*

restricted," and thus ultrahazardous.  Other factors in his conclusion were the tracks were curved, the crossing was used by large trucks and agricultural equipment, and traffic control was inadequate.  Loumiet further concludes that one or more of the following remedial measures should have been implemented prior to the collision: installation of active warning devices; use of a flagman; and removal of sight restricting trees and vegetation from the crossing.[87]  It is Mr. Loumiet's opinion that if one of these remedial measures had been implemented, the collision probably would not have occurred.[88]

Union Pacific contends that Kansas has long recognized that a railway company is not ordinarily chargeable with negligence where the obstructions of the view are outside its right-of-way and beyond its control.[89]  Thus, it argues, because Plaintiffs have not presented any evidence that Union Pacific failed to control vegetation on its right-of-way or that any vegetation on its right-of-way obscured Mr. Turner's view of the train, it had no obligation to remove the alleged vision obstructions.  However, the cases cited by Union Pacific predate cases that modify Kansas law regarding the railroad's duty with respect to an unusually dangerous crossing.  Plaintiffs do not limit their claim to one of negligence for failure to maintain the right-of-way, but instead maintain that the crossing was unusually dangerous, which would not appear to limit a claim of a crossing obstruction to one contained within the right-of-way.[90]

---

[87]*Id.*

[88]*Id.*  As discussed above, Plaintiffs' claim that the ultrahazardous nature of the crossing required active warning devices is preempted by the FRSA.

[89]*Coleman v. St. Louis-San Francisco Ry. Co.*, 286 P. 254, 258 (Kan. 1930); *Schaefer v. Ark Valley Interurban Ry. Co.*, 179 P. 323, 325 (Kan. 1919).

[90]*See Saliba*, 955 P.2d at 1193 (in determining whether crossing was unusually dangerous, court takes into account "the particular conditions and circumstances surrounding the crossing").

Moreover, the record does not support Union Pacific's claim that the undisputed evidence demonstrates that its right-of-way for "over several hundred feet from the south edge of the crossing was clear of any vegetation that could have materially obstructed a motorist's view of approaching trains."[91]  Union Pacific submits the declaration of Mr. Herring to describe the photographs taken at the scene of the accident.[92]  Herring attests to the authenticity of the photographs and that they accurately depict the condition of the Crossing on the date of the accident.  Significantly, Herring offers no explanation of the significance of the photographs, in particular the extent of Union Pacific's right-of-way, or whether they photographs depict the adjacent property owned by Mr. Spare.  Indeed, other than the photographs, Union Pacific does not submit any evidence regarding the trees and vegetation, the condition and extent of its right of way and adjacent property, or the line of sight for the Crossing.  The Court declines to make any conclusions of law based on the record before it.  Thus, material questions of fact remain as to whether the Crossing was unusually dangerous, and whether that created a duty on the part of Union Pacific to take extra precautions.  Summary judgment is denied on this claim.

### B.    "Short" Horn

Although they dropped any claim that Union Pacific failed to sound an emergency horn, Plaintiffs allege that Union Pacific's horn was sounded 1.3 seconds short in violation of 49 C.F.R. 222.21.  Subsection (b)(2) of that regulation provides that "the locomotive horn shall begin to be sounded at least 15 seconds, but no more than 20 seconds, before the locomotive

---

[91]Doc. 84 at 2.

[92]*Id*., Ex. B.

enters the crossing."  Union Pacific does not argue that this claim is preempted,[93] instead focusing on Plaintiffs' lack of evidence establishing that the purportedly short horn was the proximate cause of the accident.[94]

In support of this claim, Plaintiffs again cite Mr Loumiet's expert report.  Mr. Loumiet states that the locomotive event recorder data yielded information that the locomotive horn "was sounded approximately 13.7 seconds before impact" with Mr. Turner's truck.[95]  Mr. Loumiet does not offer any opinion or further discussion regarding the short horn.  Mr. Loumiet does opine that the crossing was extrahazardous at the time of the collision, which was a contributing factor in the collision.[96]

Plaintiffs respond that causation is a question of fact for the jury.  While this is ordinarily the case, "the plaintiff must normally prove the [purportedly] negligent act was a cause in fact of the plaintiff's injury."[97]  To obtain summary judgment, "the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim."[98] Because Plaintiffs have failed to come forward with any evidence that the short horn was the

---

[93]As discussed above, 49 U.S.C. § 20106(b) states that a claim alleging a violation of a federal standard of care is not preempted.

[94]Union Pacific also states that it believes Mr. Loumiet's calculation that the horn was first sounded 13.7 seconds before the locomotive entered the crossing is incorrect and that the train started sounding the horn 15 or more seconds before entering the crossing.  Doc. 84 at 29, n.2.  Union Pacific does not offer any evidence in support of its belief.

[95]Doc. 84, Ex. J at 4.

[96]*Id*. at 5.

[97]*Puckett v. Mt. Carmel Reg'l Med. Ctr.*, 810 P.3d 1048, 1060 (Kan. 2010) (noting that causation in fact and legal or proximate cause are separate concepts).

[98]*Nkemakolam v. St. John's Military Sch.*, No. 12-2132-JWL, 2014 WL 117258, at *1 (D. Kan. Jan. 13, 2014).

cause in fact or proximate cause of the accident, summary judgment is warranted.[99]

In so ruling, the Court notes that Plaintiffs also assert that Mr. Loumiet will give his deposition after the response had been filed, and provide evidence to support the short horn claim and causation.[100]  Fed. R. Civ. P. 56(d) states that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery. . . ."[101]  The nonmovant must explain: (1) why facts precluding summary judgment are unavailable; (2) what probable facts he can find through further discovery; (3) what steps he has taken to obtain such facts; and (4) how additional time will allow him to controvert facts.[102]  "A party may not invoke Rule 56[d] by simply stating that discovery is incomplete but must state with specificity how the additional material will rebut the summary judgment motion."[103]  Plaintiffs have made no such showing or request, and granting Union Pacific's motion on this claim is proper.

### C.    Mr. Turner's Negligence

Kansas has adopted comparative negligence, embodied in K.S.A. 60-258a, in which the loss is borne by each tortfeasor in proportion to his or her share of the total fault.[104]  The jury or

---

[99]*See Rasmusen v. White*, 970 F. Supp. 2d 807, 819 (N.D. Ill. 2013) (granting summary judgment on "short horn" claim where plaintiff's expert merely mentioned the horn sounded when the train was 1,166 feet from the crossing rather than the required 1,320 feet, when expert did not offer an opinion in his report).

[100]Doc. 137 at 16.

[101]Fed. R. Civ. P. 56(d).

[102]*Price ex rel. Price v. W. Res., Inc.*, 232 F.3d 779, 783 (10th Cir. 2000) (quotation omitted).

[103]*Garcia v. United States Air Force*, 533 F.3d 1171, 1179 (10th Cir. 2008) (quotation omitted).

[104]K.S.A. 60-258a(d); *Dodge City Implement, Inc. v. Bd. of Cnty. Com'rs of Cnty. of Barber*, 205 P.3d 1265, 1270–71 (Kan. 2009) (citation omitted).

the court will determine the percentage of negligence attributable to each of the parties and the total amount of damages sustained by each of the claimants.[105]  Where the fault of a negligent plaintiff is greater than 50%, no judgment can be entered against the defendant.[106]  Union Pacific contends that Mr. Turner's negligence was the sole proximate cause of the accident, and no reasonable jury could conclude that he was less than 50% at fault for causing his own death and the death of Ms. Hogle.

Union Pacific argues that Mr. Turner violated several aspects of Kansas law when he 1) drove his pickup truck in front of the oncoming train; 2) ignored a railroad crossbuck sign that acted as a yield sign requiring him to stop for an oncoming train and proceeding only when safe to do so; and 3) violated statutory and common law governing the duties of motorists at crossings, including K.S.A. § 8-1551.  That statute provides in relevant part:

> (a)  Whenever any person driving a vehicle approaches a railroad grade crossing under any of the circumstances state in this section, the driver of such vehicle shall stop within fifty (50) feet but not less than fifteen (15) feet from the nearest rail of such railroad, and shall not proceed until he or she can do so safely.  The foregoing requirements shall apply when: . . .
>
> (3)  A railroad train approaching within approximately one thousand five hundred (1,500) feet of the highway crossing emits a signal audible from such distance and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard; or
>
> (4)  An approaching railroad train is plainly visible and is in hazardous proximity to such crossing.[107]

---

[105]K.S.A. 60-258a(b).

[106]*Pizel v. Zuspann*, 795 P.2d 42, 53 (Kan. 1990) (citing *Pape v. Kan. Power & Light Co.*, 647 P.2d 320 (Kan. 1982)).

[107]K.S.A. 8-1551(a).

Union Pacific claims that Mr. Turner ignored all of these responsibilities when he drove his truck into the path of a train that was clearly visible, was sounding its whistle or horn, and was in obvious proximity to the crossing.  Union Pacific contends that photographs taken at the scene show a clear and unobstructed view from fifty feet west of the crossing that would have allowed Turner to see the approaching locomotive had he looked.[108]  Under these circumstances, Union Pacific argues, Turner had the duty to stop and yield to the train.  Because his failure to do so was the sole proximate cause of the accident, no reasonable jury could conclude that he was less than 50% at fault for causing his own death and the death of Ms. Hogle.

Plaintiffs respond that the issue of Mr. Turner's comparative fault is a question of fact for the jury.  The Court agrees.  "As a general rule, the presence or absence of negligence in any degree is not subject to determination by the court on summary judgment, for such a determination should be left to the trier of fact."[109]  As discussed above, a material disputed fact remains as to whether the Crossing was unusually dangerous.  Further, § 8-1551 assumes that the driver of the vehicle can either hear or see the approaching train, and thus must stop to yield. Mr. Loumiet's report opines that Mr. Turner did not see the train in time to avoid the collision, and notes skid marks appear in the gravel near the tracks.[110]  Accordingly, a material issue of fact remains on the issue of Turner's comparative fault, and summary judgment is denied on this

---

[108]Union Pacific also states that the event recorder and TIR video from the lead locomotive show that the train began sounding its horn more than 800 feet south of the crossing and that it was audible.  These facts were not set forth in Union Pacific's statement of facts, however, and as noted, under D. Kan. Rule 56.1, the Court does not consider facts that the parties discuss only in the argument section of their briefs.

[109]*Smith v. Union Pac. R.R. Co.*, 564 P.2d 514 [306] (Kan. 1977).

[110]Plaintiffs also submit photographs of skid marks on the gravel road.  As noted, under D. Kan. Rule 56.1, the Court does not consider facts that the parties discuss only in the argument section of their briefs and not in the statement of facts.

issue.[111]

### D.    Statute of Repose

Union Pacific next argues that any claim that the crossing was unreasonably dangerous is

time-barred by the Kansas Statute of Repose, K.S.A. 50-513.  This statute states in part:

> (a)  The following actions shall be brought within two years: . . .
>
> (4)  An action for injury to the rights of another, not arising on contract, and not herein enumerated. . . .
>
> (b) . . . the causes of action listed in subsection (a) shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action.[112]

Union Pacific contends that the alleged "act giving rise to the cause of action"

was

the geometric configuration of the Crossing, the angle of the intersection of 260th Road and the

tracks at the Crossing, and/or the existence of trees or vegetation near the Crossing but not on

Union Pacific's right-of-way, which existed more than ten years before the accident.  In addition,

the crossbuck signs and advance warning signs were selected and placed at the Crossing in 1997.

To determine if the statute of repose is applicable, it must be decided when the act giving

---

[111]*Cf. Dietz v. Atchison, Topeka & Santa Fe Ry. Co.*, 823 P.2d 810, 817 (Kan. Ct. App. 1991) (granting summary judgment in comparative fault case where plaintiff failed to demonstrate that defendant was negligent; plaintiff drove a vehicle carrying hazardous materials, and thus had statutory duty to stop at every crossing before proceeding).  The Court notes that Union Pacific has also given notice that it intends to compare the fault of Veronica Hogle, Stephen Spare, and Brown County, Kansas.  Pretrial Order, Doc. 120 at 11–12.

[112]K.S.A. 60-513(a), (b).

rise to the cause of action occurred.  Plaintiffs urge that this act is the vegetation and trees existing at the time of the accident that, coupled with the angle of the track, created a sight restriction that rendered the crossing unusually dangerous.  Plaintiffs allege that Union Pacific failed to properly warn and maintain the crossing, and a material issue of fact exists regarding whether the line of vegetation fluctuated over the ten-year period of repose.  Union Pacific argues that Plaintiffs failed to come forward with evidence to establish any changes to the crossing during the ten years preceding the accident.  But Union Pacific bears the burden on its affirmative defense, and on summary judgment, must show that the undisputed facts establish every element of the defense entitling it to judgment as a matter of law.[113]  The Court agrees with Plaintiffs that for Union Pacific to succeed on its affirmative defense, the Court would have to accept that there was no change to these trees and vegetation in the ten years before the accident.[114]  The deposition testimony of Ms. Turner and Ms. Stonebarger and the series of photographs of the Crossing fall short of meeting this burden.  Union Pacific's citation to *Klose v. Wood Valley Racquet Club, Inc.*,[115] is distinguishable because that case involved a structural hazard, not one caused by tree and vegetation sight restrictions.  Accordingly, although the Court acknowledges that the application of the statute of repose is a question of law, it cannot decide that question upon the summary judgment record before it.  Summary judgment is denied on this defense.

---

[113]*See Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008).

[114]Plaintiffs also submit the affidavit of counsel R. Reagan Sahadi, that attaches a series of Goggle Earth photos of the crossing over a period of time, that purported shows the line of vegetation beginning in 2006.  As noted, under D. Kan. Rule 56.1, the Court does not consider facts that the parties discuss only in the argument section of their briefs and not in the statement of facts.

[115]975 P.2d 1218, 1222 (Kan. 1999) (statute of repose barred negligence claim because tennis court lines were laid down in relation to the wall that plaintiff collided with more than ten years from the date of the accident).

###### E.    Punitive Damages

Union Pacific first argued in its motion for summary judgment that Plaintiffs cannot make a viable punitive damages claim under the facts of this case.  Specifically, Union Pacific contends that it did not know or have a reason to know that there was a high degree of probability that its conduct would result in injury, and that it acted "with wilful or wanton conduct, fraud, or malice" toward Plaintiffs or the general public.  Plaintiffs respond that a genuine issue of fact remains regarding how long Union Pacific knew the ultrahazardous crossing should be upgraded to lights and gates before the accident in this case.

In its reply, Union Pacific notes that Plaintiffs responded to its motion for partial summary judgment on Plaintiffs' claims for the survival of Veronica Hogle and Therman Turner, Sr., by dropping and acquiescing to such claims, which are no longer being asserted.[116]  Thus, Union Pacific argues, the only claims remaining in the case are for wrongful death, and Plaintiffs' claims for punitive damages fail as a matter of Kansas law.

The Court agrees.  Under Kansas law, punitive damages are not recoverable in wrongful death cases.[117]  A plaintiff is only entitled to an award of punitive damages for a survival action.[118]  The Pretrial Order separately sets forth damages for survival and wrongful death: Plaintiffs are claiming between $1 million and $7 million in survival damages for pain, mental

---

[116]Doc. 135 at 1.  Plaintiffs' survival claims were brought under K.S.A. 60-1801, seeking damages that Ms. Hogle and Mr. Turner suffered between the time of the accident and their deaths.

[117]*Smith v. Printup*, 866 P.3d 985, 998–99 (Kan. 1993); *see Eastman v. Coffeyville Res. Ref. & Mktg., LLC*, No. 10-1216-MLB, 2013 WL 3991803, at *3 (D. Kan. Aug. 5, 2013) (recognizing the continued applicability of *Smith* and noting that "punitive damages [are] not allowed in a [Kansas] wrongful death action").

[118]*Id*. at 333; *Lake v. Res-Care Kan., Inc.*, No. 98-1019-JTR, 2002 WL 32356436, at *1 (Kan. 2002) (explaining that in determining amount of punitive damages to be awarded, only the damages for the survival action may be taken into consideration, as punitive damages are not recoverable in a wrongful death action) (citation omitted).

anguish, and terror suffered by Veronica Hogle; and wrongful death damages suffered by Melissa Stonebarger, Kiatona Turner, and Therman Turner, Jr., capped at $250,000.[119]   Because Plaintiffs are no longer pursuing any survival claims, and their only remaining claims are for wrongful death and pecuniary *Wentling* damages, Union Pacific is entitled to judgment as a matter of law on Plaintiffs' punitive damages claim.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant Union Pacific's Motions for Summary Judgment are **granted in part and denied in part** as follows:

1)  summary judgment is **granted** with respect to Plaintiffs' claims of inadequate warning devices, excessive speed, proper lookout, failure to slacken speed, failure to sound emergency horn, train horn audibility, and punitive damages; and **denied** with respect to Plaintiffs' claims that the railroad crossing was unusually dangerous under Kansas law and that Therman Turner was the sole cause of the accident (Doc. 83);

2)  summary judgment is **denied** with respect to Union Pacific's affirmative defense of statute of repose Doc. 85 ; and

3)  summary judgment is **granted** on Plaintiffs' survival claims (Doc. 87).

**IT IS SO ORDERED.**

Dated: January 2, 2015

 S/ Julie A. Robinson

JULIE A. ROBINSON

---

[119]Doc. 120 at 13.  Plaintiffs also claim *Wentling* damages for loss of a complete family, services, and support, in the amount of $5 million to $25 million, which are pecuniary in nature.  *See Wentling v. Med. Anesthesia Servs.*, 701 P.2d 939, 943–44 (Kan. 1985).

UNITED STATES DISTRICT JUDGE